**Wayne Michael CAULFIELD, Plaintiff–Appellee,**

v.

**AC & D MARINE, INC. and Travelers Insurance Company, Defendants–Appellants.**

**No. 80–3356**

**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Unit A

Jan. 5, 1981.

---

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John O. Charrier, Jr., New Orleans, La., for defendants–appellants.

No appellee brief filed.

Before GEE, RUBIN and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

Plaintiff Wayne Michael Caulfield was employed by AC & D Marine, Inc. as a pilot and relief captain aboard the M/V MAERINE D. On December 21, 1978, plaintiff was aboard the M/V MAERINE D and suffered injuries when he fell over an anchor. Immediately after the accident, plaintiff received emergency medical care at a nearby hospital. The following day plaintiff was treated by Dr. Anthony La Nasa. AC & D Marine does not customarily refer injured employees to public health facilities; rather the company normally

permits an injured employee to seek care from any private physician. If the employee expresses no preference for a particular doctor, the company selects a physician to treat the injured employee. Dr. La Nasa regularly treats employees of AC & D Marine who do not have personal physicians.

On January 4, 1979, Dr. La Nasa released plaintiff for light duty with instructions to return if he experienced further pain or disability. Plaintiff continued to experience pain; however he did not return to Dr. La Nasa.

In late January, 1979, plaintiff instituted this suit against AC & D Marine and its insurer, Traveler's Insurance Company, asserting claims under the Jones Act, 46 U.S.C. § 688, general maritime law and seeking to recover maintenance and cure. Thereafter, plaintiff's attorney contacted Traveler's to discuss maintenance and cure payments. Traveler's informed plaintiff's attorney by letter that the company did "*not* expect . . . [plaintiff] to be treated at the United States Public Health Service Hospital" (emphasis in original) and that Traveler's "would be glad to pay for any medical care which is necessary" as a result of the accident.

In April, 1979, plaintiff was examined by Dr. Henry La Rocca, an orthopedic surgeon. Dr. La Rocca recommended that plaintiff be hospitalized for further tests to determine the cause of his continued pain. At this point, Traveler's informed plaintiff that it objected to his continuing under the care of Dr. La Rocca and tendered the services of Dr. Harold Stokes, another orthopedic surgeon. Dr. Stokes examined the plaintiff and found no objective clinical manifestations of damage to plaintiff's back.

Plaintiff followed the recommendation of Dr. La Rocca and entered the hospital where a venogram and a bladder pressure test indicated abnormalities in the vertebrae in plaintiff's lower back. Dr. La Rocca performed surgery on plaintiff on May 30, 1979. Finding a weakened disc between two vertebrae, Dr. La Rocca fused the vertebrae to brace the incompetent disc. The fusion results in immobility between the fused joints.

Prior to the trial of this case, the district court, pursuant to 28 U.S.C. § 636(c), severed the issues of maintenance and cure from the other claims and referred these issues to a magistrate. In a hearing before the magistrate, the parties disputed, inter alia, the questions whether the plaintiff forfeited his right to cure by seeking treatment from a private physician of his own choice and the per diem rate at which maintenance should be paid. The magistrate concluded that the defendant employer was liable for the costs of the plaintiff's medical care despite the fact that plaintiff received treatment from a physician of his own choosing rather than from the doctor preferred by the company. The magistrate concluded that $15 per day was "a fair and reasonable estimate of this plaintiff's daily living expenses ashore during his period of recuperation."

The district court entered judgment for the plaintiff, ordering the defendants to reimburse plaintiff for his medical expenses and to pay maintenance at the rate of $15 per day from the date of the accident until such time as the plaintiff was fit for duty or had reached the point of maximum care.

On appeal, defendant–appellants argue, first, that the award of maintenance at the rate of $15 per day is unsupported by any evidence in the record and thus "clearly erroneous," and second, that plaintiff rejected the defendant's "tender of cure" and thus forfeited his claim to recover his medical expenses.

## I. THE PER DIEM RATE OF MAINTENANCE

A seaman who is injured or falls ill while he is in the service of the ship is entitled to recover "maintenance" from his employer or the shipowner. Maintenance is intended to cover the reasonable costs the seaman incurs in acquiring food and lodging ashore during the period of his illness or disability. The obligation to provide maintenance and the accompanying duty to

tender cure, i. e., medical care, to an ill or injured seaman are "among the most ancient and pervasive of all the liabilities imposed on a shipowner." *Oswalt v. Williamson Towing Company, Inc.*, 488 F.2d 51, 54 (5th Cir. 1974). The Supreme Court has long recognized the importance of these remedies, *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903); *Chelentis v. Luckenbach S. S. Co.*, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171 (1918), and has declared that the doctrines of maintenance and cure are to be liberally construed to benefit the seaman. "When there are ambiguities or doubts, they are resolved in favor of the seaman." *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962).

Maintenance payments are designed to provide subsistence to the injured seaman and not to compensate the seaman for any specific injury or damage; thus the rate at which maintenance is paid tends to become standardized to reflect the costs of food and lodging in a particular area. The customary rate in this circuit, as well as many other areas, has long been $8 per day.

Recently, however, commentators have noted that the tendency to standardize maintenance awards without adjustments to reflect the effect of inflation on the seaman's cost of living threatened to eviscerate the traditional concept of maintenance.

> The failure to adjust the rate to reflect inflation suggests that maintenance is no longer regarded as a living allowance sufficient to support even the proverbially impecunious unmarried male seaman in the modest circumstances to which he is thought to be entitled.

G. Gilmore and C. Black, Jr., The Law of Admiralty, 307 (2nd ed. 1975).

> Today, practically no one is capable of maintaining himself at the $8.00 per day, especially ashore. If maintenance is to retain the same definition that it had many years ago, this rate is obviously unrealistic . . .

1B Benedict on Admiralty, § 51 (7th ed. 1976).

Courts have also become sensitive to the fact that the standard award of $8 per day may be inadequate to cover the basic costs of food and lodging. In *Robinson v. Plimsoll Marine, Inc.*, 460 F.Supp. 949 (E.D.La. 1978), an injured seaman sought to increase his maintenance, which was then being paid at the $8 per day rate, to an amount which would actually cover his basic expenses of living ashore. The district court reasoned that although $8 per day had been the customary rate of maintenance in the Eastern District of Louisiana for almost fifteen years, the amount of maintenance due remained essentially a factual question. *Id.* at 950. On the basis of testimony by an expert witness, the court concluded that meals and lodging costing $8 per day in 1969 would cost approximately $15 per day in 1978 and that plaintiff's daily maintenance should be paid at this higher rate.

 The amount of maintenance to which an injured seaman is entitled is a question of fact. *United States v. Robinson*, 170 F.2d 578 (5th Cir. 1948). Thus our review of the district court's award of $15 per day is limited by the clearly erroneous standard of Fed.R.Civ.P. 52(a). In this case, plaintiff did not offer any expert testimony similar to that in *Plimsoll Marine.* The defendant argues that in the absence of such testimony there is no evidence to support maintenance in excess of the customary $8 per day and thus the award is clearly erroneous. We disagree.

In this case, plaintiff himself testified as to the average costs he incurred for food and lodging during his period of disability. Plaintiff testified that food similar to that he usually ate aboard the ship cost approximately $9 to $10 per day when he purchased it ashore and that lodging would cost approximately $12 per day. We believe that the seaman's own testimony as to his expenses is competent, probative evidence of the amount of maintenance due. The defendant offered no evidence that these figures were unreasonable or inaccurate estimates of the costs of subsistence in the New Orleans area. Based upon this record we cannot say that the district court clearly

erred when it ordered maintenance at the rate of $15 per day based upon the magistrate's conclusion that this sum was a "fair and reasonable estimate of plaintiff's daily living expenses ashore during his period of recuperation."

## II. THE PLAINTIFF'S RIGHT TO RECOVER THE COSTS OF HIS CURE

Appellant relies on this court's opinion in *Sanford Bros. Boats, Inc. v. Vidrine,* 412 F.2d 958 (5th Cir. 1969), as authority for its argument that the plaintiff here, by continuing to seek care from a private physician of his own choice after being informed that the employer wished to provide medical care through another private physician, forfeited his right to reimbursement for his subsequent medical expenses. In *Sanford Bros.,* the employer initially authorized the injured seaman to seek private medical treatment. Later however, the employer informed the seaman that he was expected to take advantage of the free services at the United States Public Health Service Hospital if he required further care. We concluded in *Sanford,* that the seaman could not recover the costs of private medical care incurred subsequent to the employer's change in policy.

Appellant would read *Sanford* as establishing a general rule that when the employer, after first authorizing the seaman to seek treatment from a physician of his choice, later directs the seaman to accept treatment from a facility chosen by the employer, the seaman has an obligation to make use of that facility regardless of whether the employer chooses the Public Health Service, as in *Sanford,* or a particular private physician, as here. We do not read *Sanford* so broadly.

■ The general rule, reiterated in *Sanford,* is that a seaman has a duty to mitigate the costs of cure by accepting the employer's tender of free treatment by the Public Health Service unless the seaman establishes that these services are inadequate. If a seaman refuses the treatment of the Public Health Service without just cause he forfeits his right to recover the

costs of his maintenance and cure. *Kossick v. United Fruit Co.,* 365 U.S. 731, 737, 81 S.Ct. 886, 891, 6 L.Ed.2d 56 (1961); *Pelotto v. L & N Towing Co.,* 604 F.2d 396 (5th Cir. 1979). Based on this general rule we reasoned in *Sanford* that the seaman's duty to seek free care from the Public Health Service was suspended for so long as the employer authorized him to receive private treatment. However, when the employer notified the seaman that in the future care would be provided through the Public Health Service, the seaman's duty to mitigate damages by employing public hospital facilities was reinstated.

This duty to mitigate damages was the determinative factor in *Sanford.* The public medical services tendered by the employer in *Sanford* were completely free; neither the employer (or his insurer) nor the employee actually pays for treatment at a public health facility. Care is provided free of charge by the government. When an employee rejects such care and seeks private medical care, it is inevitable that the employer will incur costs which would have been avoided if the employee had accepted treatment at a public health facility.

The seaman's obligation to comply with the employer's direction to accept care at a public facility is not primarily based on a policy of allowing the employer freedom to decide where his employees shall receive medical care, but upon a mitigation of damages rationale. The employee is required to make use of the public facilities when the employer requests that he do so not merely because this is the employer's preference but because any private medical care will entail an expense to the employer which would be avoided by use of public facilities.

■ The critical distinction between *Sanford* and the case now before us is that here the employer never instructed the seaman to make use of the free services available at the Public Health Service Hospital. Here the employer, after originally authorizing the plaintiff to seek treatment from the doctor of his choice, informed the seaman that if he should require further care he

was expected to see a private physician chosen by the employer. Under circumstances such as these where the employer tenders to a seaman not the free care of the Public Health Service, but care from a particular private physician, we have held that the seaman does not breach his obligation to mitigate damages merely by choosing to see a different private doctor.

In *Oswalt v. Williamson Towing Co.*, 488 F.2d 51, 54 (5th Cir. 1974), Judge Goldberg, who also authored the opinion in *Sanford*, held that the seaman's decision to seek medical care from a private physician in his home town of Jackson, Mississippi rather than seeing a doctor in Greenville, to whom the employer had referred the plaintiff, did not bar the plaintiff's recovery of medical expenses from his employer even in the absence of a showing by the plaintiff that the private care in Greenville was inadequate. *Oswalt* clearly forecloses the broader reading of *Sanford* suggested by appellants and it is *Oswalt* not *Sanford* that controls our decision here. In *Oswalt*, as here, the employer did not customarily refer injured employees to free, government–operated facilities; rather the employer sent injured employees to private physicians. Based upon this policy, Judge Goldberg reasoned that

> "[t]he cost of doctors' bills and subsistence payments during the course of treatment are therefore a regular feature of defendant's business and would have been paid by defendant even had plaintiff accepted the original offer of care. Plaintiff's decision to seek treatment in Jackson, however unreasonable in light of the quality of care available in Greenville, did not necessarily result in expenditures that could have been avoided." *Oswalt, supra* at 54.

▮ Judge Goldberg's opinion in *Oswalt* explicitly suggests that the question presented when an employee rejects a physician or medical facility designated by the employer is to be analyzed as a mitigation of damages problem ". . . the rationale of all decisions on the effect of the seaman's refusal of cure on the award of maintenance and cure, requires that plaintiff receive no more compensation than would have been necessary had he acquiesced in defendant's program." *Oswalt, supra,* at 55. Thus, if a plaintiff refuses the employer's offer of adequate treatment at a public hospital and instead seeks private care, all of his private medical expenses are non–compensable because his public care would have cost the employer nothing–this was the case in *Sanford*. But if a seaman merely seeks his own private physician rather than another chosen by the employer he forfeits only that amount of compensation, if any, that would have been saved if he had received the necessary care from the employer's doctor–this was the situation in *Oswalt* and in the instant case.[1]

In *Oswalt*, Judge Goldberg remanded the case for determination of the question whether the "service expended for care in Jackson, however reasonable, exceeded the cost of similar care which defendant had tendered in Greenville." *Oswalt*, at 54–55. *Oswalt* did not, however, explicitly discuss the question of how the burden of proof should be allocated on this question at the trial level. For reasons of logic and fairness, we believe that the district court here appropriately placed the burden on the defendant to show that the cost of the plaintiff's treatment unnecessarily exceeded that which the employer would have incurred had the employee followed the employer's recommendation regarding a physician.

In cases where the employer refers the seaman to a public facility and the seaman refuses such care, the seaman forfeits his right to reimbursement for the costs of private medical care unless he carries the burden of proving that the tendered public services were inadequate. This allocation of the burden of proof reflects the assumption that public care is usually adequate and

---

1. If the employer had tendered the services of a company doctor who receives a fixed salary as compensation for providing necessary medical care to other employees or the prepaid services of a health maintenance organization, we would have a situation more closely analogous to *Sanford*.

thus any expenses incurred for private care are probably unnecessary. A showing that the public services were inadequate thus establishes an unusual circumstance creating an exception to the general rule of forfeiture. Consequently, it seems logically appropriate to place the burden on the seaman to show that his case fell within the exception.

In a case where an employee receives treatment from one private physician rather than another, logic does not similarly compel placing on the plaintiff the burden of proving that his conduct did not result in unnecessary expense to the employer. In the latter case, unlike the former, there seems no reason to assume that the employer incurred extra expense as a result of the employee's decision. If we presume that, the practice of medicine, although not an exact science, reflects a generally accepted body of knowledge concerning diagnosis and treatment, then it seems more reasonable to presume that the employee would have received similar care from either physician and that the employer would have incurred comparable costs. Consequently, the burden here logically should be on the employer to establish an exceptional circumstance, e. g., that the doctor chosen by the employee provided unnecessary treatment or that his fees were higher than those the employer's physician would have charged for the same services. This allocation of the burden of proof also seems proper in light of the fact that evidence concerning the course of treatment which the employer's doctor would have prescribed and the cost of such treatment would be more easily obtained by the employer than the seaman.[2] Further, there seems little justification for imposing on the plaintiff the 'onerous burden of proving a negative—that the medical costs he incurred in the course of treatment from his physician did *not* exceed the costs the employer would have incurred had the necessary treatment

been provided by the physician chosen by the employer. The cause of action for maintenance and cure is intended to afford a seaman a simple remedy for losses resulting from employment–related injuries and, as we noted above, this remedy has always been liberally construed in favor of the seaman.

The defendant in this case attempted to show that its physician found no indications that the plaintiff required surgery and argued that the expenses incurred in connection with the operation were unnecessary. Based on the magistrate's recommendations, the district court rejected the testimony of the defendant's physician, Dr. Stokes, because he had not performed tests of the type which Dr. La Rocca employed in determining that surgery was indicated. The court in approving the magistrate's recommendations found that the employer did not incur any unnecessary expense as a result of the seaman's decision to seek care from Dr. La Rocca rather than from Dr. Stokes. This finding does not appear clearly erroneous.

The judgment is AFFIRMED.

---

2. McCormick's treatise on evidence suggests that allocation of burdens of proof often reflect the factors which we analyze here—"the judicial estimate of the probabilities of the situation" and the doctrine that "where the facts with

regard to an issue lie peculiarly in the knowledge of a party, that party has the burden of proving the issue." McCormick, The Law of Evidence, at 786–87 (2d. ed., E. Cleary, ed. 1972).