Lee D. HARPER, Plaintiff-Appellee,

v.

ZAPATA OFF–SHORE COMPANY,
Defendant-Appellant.

No. 83–3149.

United States Court of Appeals,
Fifth Circuit.

Sept. 7, 1984.

Abbott, Webb, Best and Meeks, Daniel
A. Webb, Michael G. Cordes, New Orleans,
La., for defendant-appellant.

Michael A. McGlone, James F. Shuey,
New Orleans, La., amicus curiae, for Off-
shore Marine Serv. Ass'n.

Henderson, Hanemann & Morris, Philip E. Henderson, Houma, La., J. Fletcher Jones, Andalusia, Ala., for plaintiff-appellee.

Before REAVLEY, JOHNSON and JOLLY, Circuit Judges.

REAVLEY, Circuit Judge:

Lee D. Harper brought suit under the Jones Act and general maritime law for injuries suffered while working on Zapata Off-Shore Company's drilling barge and for inadequate maintenance. By this appeal, Zapata challenges the award of punitive damages and the amount of compensatory damages and maintenance found by the jury. We reverse and remand.

## I. Background

Harper was attempting to carry a 90-pound rotary coupling part from the heliport on Zapata's drilling barge to a storage room below. While Harper was going down a steep flight of stairs, the barge shifted and he stumbled, injuring his back. The accident required Harper to have back surgery on two occasions to remove extrusions of ruptured discs. Following the incident Zapata paid for Harper's medical expenses and gave him a check for $638 every two weeks. The check specified that $112 was for maintenance and that $526 was an "advance." When Zapata learned that Harper was suing, it terminated the advances, but continued to pay maintenance of $8 a day ($112 every two weeks).

In a jury trial Harper sued for compensatory damages, increased maintenance, and attorney's fees and punitive damages for Zapata's failure to pay a proper amount of maintenance. The jury found that Zapata was negligent and that the vessel was unseaworthy and awarded Harper $40 a day in maintenance, $1,000,000 in compensatory damages, $500,000 in punitive damages, and $5,000 in attorney's fees. In response to Zapata's motion for new trial, the district court reduced the punitive damages award to $250,000 on remittitur, which Harper accepted.

## II. Punitive Damages and Attorney's Fees

Zapata's position in the briefs and at oral argument was that lump-sum punitive damage awards could not be grounded on a failure to pay maintenance. The seminal case of *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), had been construed differently by the First and Second Circuits. *Compare Kraljic v. Berman Enterprises, Inc.*, 575 F.2d 412 (2d Cir.1978) (*Vaughan* authorizes only attorney's fees as punitive damages) *with Robinson v. Pocahontas, Inc.*, 477 F.2d 1048 (1st Cir.1973) (traditional exemplary damages permitted if shipowner wantonly refuses to pay maintenance). We have recently agreed with the First Circuit that punitive damages for the willful and arbitrary refusal to pay maintenance are available under general maritime law. *See Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110, 1118 (5th Cir.1984); *see also In re Merry Shipping, Co.*, 650 F.2d 622 (5th Cir.1981) (Unit B) (punitive damages allowed for willfully and wantonly creating or maintaining unseaworthy conditions).

It does not follow, however, that punitive damages may be based on a shipowner's failure to pay *adequate* maintenance. Zapata argues that the district court erred by allowing the jury to impose punitive damages merely because Zapata paid a maintenance rate that the jury later found to be inadequate. We agree. On this record, the district court should not have submitted the questions of punitive damages or attorney's fees to the jury. *See Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc). Both awards must be grounded on the same type of egregious shipowner conduct exhibiting wanton and intentional disregard of a seaman's rights. *See Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Kraljic v. Berman Enterprises, Inc.*, 575 F.2d 412, 416 (2d Cir.1978).

Harper does not dispute that Zapata consistently paid the traditional maintenance rate of $8 a day and designated those payments as maintenance. Instead, he attacks a settlement procedure employed by Zapata in dealing with injured employees. Every two weeks, while Harper was recuperating, Zapata paid him $526 as an "advance," along with maintenance. In addition, Zapata twice provided Harper with $3000 to help out with household expenses and personal bills. Testimony established that Zapata had no intention of recovering these "advances," but that the payments were made with a view toward settling claims without litigation.[1] Zapata's claims representative stated at trial that he informed Harper that he would not have to repay the advances, but that if he instituted suit, Zapata would terminate the advances and pay the $8 amount that it thought was its legal obligation.

During the examination of Zapata's claims representatives, the district court instructed the jury that Zapata's advances were not to be credited toward maintenance—"the advances [have] nothing to do with the proper amount of maintenance."[2] Yet the court, in referring to the punitive damages issue, told the jury that it "should consider the total actions of Zapata in connection with this case ...."

We cannot escape the conclusion that the jury penalized Zapata for terminating its advances. During closing argument, Harper's counsel repeatedly emphasized the millions of dollars Zapata saved with settlement efforts.[3]

■ For purposes of the punitive damages issue, the district court appeared to have considered the settlement advances as maintenance payments. The court stated that it "share[d] the jury's apparent outrage produced by defendant's intentional evil practice of attempting to prevent litigation by cutting the maintenance rate to a starvation level." *Harper v. Zapata Off-Shore Co.*, 563 F.Supp. 576, 585 (E.D.La. 1983). Despite stating that "the evidence supporting punitive damages was overwhelming," the court cited only the termination of advances and the "starvation payment" of $8 a day. The district court did not find that the advances were maintenance payments in disguise, and the jury was not allowed to credit the advances toward Zapata's maintenance payments. Therefore, we think it was improper to view termination of settlement efforts as an evil reduction in maintenance. The special verdict only asked, "Was defendant's failure to pay an amount of maintenance higher than $8 per day intentional and with callous disregard for the plaintiff's rights?"

The cases in which punitive damages or attorney's fees have been granted share

1. Harper testified that, because of rising expenses, he asked Zapata for "an advance or some kind of a loan or something to help out." He stated that he intended to repay the advances out of any recovery he obtained.

2. While discussing the punitive damages charge with counsel, the district court referred to the advances as loans. In the Order and Reasons, however, the district court referred three times to the termination of advances as a reduction in maintenance. *Harper v. Zapata Off-Shore Co.*, 563 F.Supp. 576, 584–585 (E.D.La.1983).

3. [Zapata goes] out and they get these injured workers and they make them advances, yeah. They don't tell you it's a gift, it's an advance and the poor man worries if he doesn't take what they want to do then he is in trouble and then they tell him if you go get a lawyer, exercise the rights ... we are going to cut you

back to $56 a week and we are going to give you a little reminder of that with every check. We write down their maintenance, you see, the $112 every two weeks, $56 a week. That's what they do to scare these people.... Let me tell you, they've been doing this for years. How many millions of dollars do you think Zapata has saved by doing that over these years, how many millions do you think they've saved themselves by giving some poor fellow, go to his house, and have somebody sit down and tell him if you, we get an adversary position if you get a lawyer, we're going to cut you to $56 when the right time comes, we're going to settle it but it better be in our favor then when he comes by he makes some small settlement because the man is scared to get a lawyer. He can't live, Zapata has saved millions, taken millions out of people's pockets by denying them their legal rights by doing that and that's just not right.

the common element of a shipowner's default, either in failing to provide maintenance and cure or in failing to investigate an injured seaman's claim. *See Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (shipowner exhibited willful and persistent default and did not investigate seaman's claim); *Holmes v. J. Ray McDermott & Co.,* 734 F.2d 1110 (5th Cir. 1984) (shipowner failed to reinstate seaman's maintenance and cure after seaman gave notice of claim based on diagnosis of herniated disc); *Picou v. American Off-shore Fleet, Inc.,* 576 F.2d 585 (5th Cir. 1978) (trial court awarded attorney's fees and punitive damages because shipowner, in face of seaman's attempts to obtain maintenance and cure, failed to investigate claim and to pay maintenance); *Kraljic v. Berman Enterprises, Inc.,* 575 F.2d 412 (2d Cir.1978) (attorney's fees awarded because shipowner willfully refused to provide maintenance and cure); *Robinson v. Pocahontas, Inc.,* 477 F.2d 1048 (1st Cir. 1973) (shipowner terminated all maintenance payments after seaman refused settlement offer; shipowner initially refused to pay past due wages to seaman, using pretext that he was fired for cause); *Hodges v. Keystone Shipping Co.,* 578 F.Supp. 620 (S.D.Tex.1983) (shipowner, without justification, paid none of seaman's medical bills and paid no maintenance until suit filed, approximately ten months after receiving demand for maintenance and cure); *Solet v. M/V Capt. H.V. Dufrene,* 303 F.Supp. 980 (E.D.La.1969) (attorney's fees awarded for shipowner's willful and persistent default in paying maintenance).

Courts have refused to allow awards of attorney's fees or punitive damages in cases in which the shipowner's conduct was not sufficiently egregious or wanton. *See e.g., Ober v. Penrod Drilling Co.,* 726 F.2d 1035, 1037 n. 4 (5th Cir.1984) (per curiam) (attorney's fees and damages for mental anguish are not recoverable solely based on untimely payment of maintenance and cure); *Richard v. Bauer Dredging Co.,* 433 F.2d 954 (5th Cir.1970) (per curiam) (record failed to demonstrate arbitrary or capricious conduct prerequisite to the allowance of attorney's fees); *Constance v. Johnston Drilling Co.,* 422 F.2d 369 (5th Cir.1970) (per curiam) (seaman not entitled to attorney's fees; no suggestion that shipowner, who had paid lower amount of maintenance than that finally awarded, was lax in investigating claim or acted arbitrarily or unreasonably); *cf. Smith v. Atlas Off-Shore Boat Service, Inc.,* 653 F.2d 1057, 1064 (5th Cir.1981) (punitive damages not imposed on shipowner who terminated employment of seaman who persisted in personal injury claim).

No bright line separates the type of conduct that properly grounds an award of punitive damages—a shipowner's willful and callous default in its duty of investigating claims and providing maintenance and cure—from the type of conduct that does not support a punitive damages award. We do not attempt to draw the line between an absolute failure to provide maintenance and cure and the payment of a nominal amount of maintenance. Clearly, a shipowner who attempts to comply with its duty of providing maintenance by paying a seaman $1 a day would be subject to punitive damages. We think that shipowners who pay a grossly inadequate amount of maintenance in callous disregard of the seaman's rights should not be shielded from punitive damages. Therefore, we must distinguish between payment of a grossly inadequate maintenance sum and good faith payment of a maintenance rate that at trial may turn out to have been inadequate to cover the costs of food and lodging.

█ We hold that Zapata's conduct in dealing with Harper's claim was not of a type, within the meaning of *Vaughan v. Atkinson,* that would support punitive damages and attorney's fees. Zapata's actions in paying $8 a day for maintenance were undoubtedly undertaken willfully in the sense that it intended to pay what it paid in fact. We think, however, that the willful, wanton and callous conduct required to ground an award of punitive damages requires an element of bad faith. The record shows that Zapata did not act in

callous disregard of Harper's rights. Zapata timely investigated his claim, paid all his medical bills, and made regular maintenance payments.

Although $8 daily is unquestionably a low maintenance payment, that sum had become entrenched over the years as the standard figure. *See Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1132 (5th Cir. 1981); 1B *Benedict on Admiralty* § 51 at 4–74 (7th ed. 1983). We acknowledge that the $8 rate has now been substantially eroded by decisions in the last few years. *See Wood v. Diamond M. Drilling Co.*, 691 F.2d 1165, 1171 (5th Cir.1982) ($30 a day); *Morel v. Sabine Towing & Transportation Co.*, 669 F.2d 345, 347–48 (5th Cir.1982) ($20 a day); *Caulfield*, 633 F.2d at 1132–33 ($15 a day). The $8 rate, however, has not totally disappeared. *See Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 375 (5th Cir.1981); *Tate v. American Tugs, Inc.*, 634 F.2d 869 (5th Cir.1981) (denial of injunction to increase $8 maintenance); *Grove v. Dixie Carriers, Inc.*, 553 F.Supp. 777, 780 (E.D.La.1982) (seaman bound by $8 maintenance rate provided in collective bargaining agreement) ("rate of $8.00 per day for maintenance . . . has been the standard rate in this Circuit for a substantial number of years and from which the Courts have only recently departed"). We decline to impute bad faith to Zapata's decision to pay what it considered to be the legal minimum. We note that, after Zapata terminated its settlement efforts and payments, Harper failed to seek an increase in the amount of maintenance he was receiving. Zapata received notice of Harper's claim for increased maintenance only two or three weeks before trial early in 1983. Accordingly, we reverse the awards of punitive damages and attorney's fees.

### III. Maintenance

Zapata contests the jury's determination that $40 was the proper amount that it should have paid Harper. It claims that no evidence supports fixing maintenance at $40.

"Maintenance is intended to cover the reasonable costs the seaman incurs in acquiring food and lodging ashore during the period of his illness or disability." *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1131 (5th Cir.1981). "[T]he seaman's own testimony as to his expenses is competent, probative evidence of the amount of maintenance due." *Id.* at 1132.

Although Harper provided no lay or expert testimony concerning his actual expenses for food ashore, he did testify that Zapata provided its seamen with a $20 daily allowance for food when Zapata sent them ashore for school or during stormy weather. This testimony constituted probative evidence to support a maintenance award covering food expenses.

■ During Harper's period of cure, he resided at his home with his wife and children. The record, however, is devoid of any evidence that Harper incurred lodging expenses. Because a seaman is not entitled to maintenance unless he incurs costs, *see Johnson v. United States*, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948); *Marine Drilling, Inc. v. Landry*, 302 F.2d 127 (5th Cir.1962), we hold that a reasonable jury could not have found that reasonable maintenance was $40. Any amount of the maintenance award designed to compensate Harper for reasonable lodging costs has no evidentiary basis.

### IV. Excessive Compensatory Damages

Zapata claims that the jury's award of $1,000,000 in compensatory damages resulted from passion and prejudice. We need not speculate on the motivation of the jury, because we agree with Zapata's alternative argument: the award of compensatory damages exceeded the maximum that any reasonable jury could have awarded. *See Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778 (5th Cir.1983); *Perricone v. Kansas City Southern Railway*, 630 F.2d 317 (5th Cir.1980); *Howell v. Marmpegaso Compania Naviera, S.A.*, 536 F.2d 1032 (5th Cir.1976).

During closing argument, counsel for Harper requested $390,000 for wage loss. He stated that he did not think that Harper would be totally disabled for the rest of his working life and that he would like to work, even if it was part-time. Thus, counsel took the figure of $340,358, supplied by an economic expert, which would compensate Harper for past and future wage loss, assuming that he would be able to do some work in the future at minimum wage. The estimate reached $390,000 by including a 15 percent increase to account for the likelihood that Harper would have been promoted to a higher paying job. Counsel also sought $150,000 as compensation for Harper's past and future pain and suffering, although he suggested that the jury could award twice or three times that amount. Assuming that the jury accepted counsel's estimate of total wage loss, it awarded $610,000 for pain and suffering, over four times the amount requested.

Harper underwent two laminectomies and still experiences back pain and some leg pain. He compared his pain to a toothache. Harper's wife testified that he experiences pain and has trouble sleeping at night and that some of his days are worse than others. Harper testified that his back hurts as bad as it ever did and that walking at least a mile a day has not helped his condition.

Dr. Eyster, the neurosurgeon who performed the first laminectomy, thought Harper was doing well after the operation. He stated that Harper had some back pain and no leg pain and estimated his permanent impairment at 15 percent. Dr. Hackman, the neurosurgeon who performed Harper's second laminectomy, saw him several times after surgery. Dr. Hackman put Harper on medication and stated that his aches and pains were helped tremendously. Dr. Hackman ran an electromyography (EMG) test, which was normal, and discharged Harper because his examination was unremarkable and his leg pain was gone. The doctor estimated Harper's permanent impairment at ten percent.

Dr. Manale, an orthopedic surgeon, saw Harper twice. He agreed that the EMG showed that Harper was normal neurologically because his reflexes were fine. Dr. Manale estimated Harper's minimum physical impairment at 30 percent and thought that he should not work unless he could do some part-time work where he would not have to drive or leave his home. The doctor indicated that if Harper wore a corset it would help by reducing motion in his spine.

Based on the evidence in the record, the jury could have concluded that Harper would never be able to work again. The highest amount in evidence that would compensate Harper for total wage loss, assuming total disability, was approximately $448,000.[4] Assuming that the jury increased this figure by 15 percent to accommodate the possibility that Harper would have been promoted, the highest amount for total wage loss supported by the evidence was approximately $515,000. Thus,

---

4. Before he was injured, Harper worked seven days on, at twelve hours a day, and seven days off, at an hourly wage of $9.05. Dr. Boudreaux, Zapata's economic expert, calculated Harper's annual pay at approximately $24,940. Adding six percent to account for variations such as increased productivity and inflation, Dr. Boudreaux testified that if Harper could not return to work, $308,462 invested conservatively would produce an income stream representing the after-tax pay that Harper would have lost over the 19.5 years of his remaining work life. Dr. Boudreaux calculated Harper's lost wages from the time of the accident to the trial date at $41,565. Assuming that Harper could not work, the loss of his past and future wages equalled $350,027, based on an annual salary of $24,940.

Zapata stopped paying Harper on April 1, 1981, approximately three weeks after the accident. Harper introduced into evidence his W-2 statement for 1981, which reflected compensation from Zapata in the amount of $8,225. Harper's counsel asked Dr. Boudreaux to take that figure, which represented payment for a three-month period, and to assume that Harper would have continued at that level during the remainder of 1981. He then estimated an annual wage of $32,900. Taking the tax effect into account, the economist calculated that Harper's annual wage, based on the W-2 statement, was 28 percent higher than the annual wage estimate of $24,940. Increasing the figure of $350,027 by 28 percent yielded $448,035.

the jury awarded at least $485,000 for Harper's past and future pain and suffering.

 While Harper has suffered a painful injury, has undergone two back operations, and continues to live with some pain, his lot is far from excruciating agony. He can enjoy life by taking care in his activities and, perhaps, by the use of a corset and by taking some medication. We conclude that an award approximating $485,000 for pain is excessive.

"Our power to grant a remittitur is the same as that of the district court." *Caldarera*, 705 F.2d at 784. We determine that the maximum award of compensatory damages supported by the evidence is $800,000. We order a new trial of Harper's claims against Zapata unless Harper will accept a remittitur of the verdict—compensatory damages in the amount of $800,000 and maintenance in the amount of $20 daily.

REVERSED and REMANDED.

E. GRADY JOLLY, Circuit Judge, dissenting in part:

I dissent in the name of common sense, to part IV of the opinion.

The majority allows $515,000 for lost wages in this case. A conservative investment of these funds would yield to the plaintiff an annual income of $60,000. When the plaintiff was able bodied and fully employed by the defendant in this case, he earned approximately $30,000 [1] per annum. The injured plaintiff now earns $60,000 a year to compensate him for a job paying $30,000 per year. (I will not mention that the plaintiff is still able to work and earn a living in non-strenuous jobs.) Such an unrealistic and air-built result is rich fodder for those who would ridicule and contemn our courts.

It is clear to me that in this case the jury became outraged over a matter which we now hold that it had no basis to be outraged about. The verdict, in all of its parts, is a product of that unfounded outrage. The case should be sent back for a retrial on damages. That is what I would do and what ought to be done in this case for the sake of a fair and sober result.

---

**1.** The plaintiff earned $9.05 per hour. With overtime, the plaintiff's pay at the time of the accident, if the proposed work-week schedule was actually worked, would have been $32,900 a year.