MARITIME OVERSEAS CORPO-
RATION and Transbulk Car-
riers, Inc., Appellants,

v.

Thomas C. WAITERS, Appellee.

No. 01–94–00178–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 13, 1995.

Jeffrey Bale, Houston, for Appellants.

Harold Eisenman, Houston, Walter Steinman, Bala Cynwyd, PA, for Appellee.

Before O'CONNOR, HUTSON–DUNN and WILSON, JJ.

## OPINION

O'CONNOR, Justice.

We are asked to decide (1) whether compensatory and punitive damages can be awarded to an injured seaman in an action under general maritime law for sick leave and unpaid medical bills (maintenance and cure), and (2) whether the actions of the shipowner in cutting off maintenance and cure based on the opinion of its doctor is arbitrary and capricious behavior.

A jury awarded the appellee seaman, Thomas C. Waiters (Waiters), $728 for past due maintenance, $2,725 for past due cure, $1,000.00 in compensatory damages and $10,000 in punitive damages when it found Waiters' employers, the appellants, Maritime Overseas Corporation and Transbulk Carriers, Inc. (Maritime), did not timely pay maintenance and cure. We affirm the portion of the judgment awarding compensatory damages and punitive damages, but reform it to deduct prejudgment interest.

## Fact Summary

At 7:00 a.m. on March 29, 1989, Waiters, a steward's assistant aboard the OVERSEAS MARILYN, had just completed his morning tasks of sweeping, mopping, and collecting the trash. He was scheduled to help make breakfast and was hurrying down the stairs carrying a trash bag and mop in one hand and a dustpan in the other. He slipped on the fourth step, fell down the remaining eight steps, and landed on his back.[1] Waiters got up and reported the accident to the captain, then went to his room, took an aspirin, and went to bed.

Waiters testified he asked the captain to see a doctor, but no arrangements were made that day. Captain Robert Thompson testified that Waiters did not indicate there was an emergency. Two days later, Waiters saw Dr. A.J. Lombardo in New Orleans. Dr. Lombardo told Waiters he should be able to return to duty in five to seven days. On his report, Dr. Lombardo diagnosed Waiters as having a strained back with a contusion,[2] and contusions on his left elbow, left wrist, and left middle finger. He recommended that Waiters take hot showers and oral medicine for pain relief and muscle relaxation. Dr. Lombardo said in his report that he wanted to recheck Waiters on April 3. In his April 3, 1989, report, Dr. Lombardo said Waiters was not fit to perform his duties and recommended Waiters see an orthopedic specialist for X-rays. Dr. Gernon Brown, an orthopedic surgeon, examined Waiters on April 10, 1989. In his report, Brown said Waiters had "restriction of motion of the lumbar spine. The patient's symptoms and physical findings are compatible with a contusion of the sacrum and coccygeal area." Dr. Brown recommended Waiters continue with the hot showers and muscle relaxation treatment. Waiters testified that he was in a lot of pain

---

1. Waiters claimed there was a greasy substance on the steps, but the captain of the ship testified there was nothing on the step. The stairs included 12 steps. Each step has a nonskid strip on it.

2. A contusion is commonly known as a bruise.

after seeing Dr. Brown and returned to Houston. On April 19, 1989, Waiters saw Dr. Zoran Cupic, another orthopedic surgeon who was recommended by the seafarer's union. Dr. Cupic stated in his report that Waiters was unfit for duty. Dr. Cupic's report stated Waiters had cervical strain and was walking with difficulty. On May 1, 1989, Dr. Cupic stated in his medical log that Waiters had a lot of pain in his lower back. Dr. Cupic recommended Waiters be admitted to the hospital as soon as possible for treatment. On June 22, 1989, Dr. John Andrew, a doctor located by Maritime, examined Waiters and reported that Waiters had reached maximum cure and was fit for duty. In a July 18, 1989, annual physical Dr. Jack Mazow found Waiters fit for duty. Waiters saw Dr. Cupic again on August 9, 1989. In his August 9 report, Dr. Cupic states

> he [Waiters] has pain radiating to the left buttock and left lower extremity. The patient is short of funds, however, and apparently nobody is willing to pay for his hospitalization. He would like to go back to work on a trial basis and see how that works. We are going to give him a note to go back to work on a trial basis.

Waiters continued to see Dr. Cupic. Maritime paid for Waiters' maintenance and cure from April 4, 1989, through June 28, 1989. Based on Dr. Andrew's opinion that Waiters had reached maximum cure on June 22, Maritime did not pay maintenance for the period from June 29, 1989, through August 9, 1989, even though it was requested.

Waiters started working aboard ships again on November 5, 1989. He worked short-term shifts on two other ships before joining the M/V SEA–LAND COMMITMENT as a steward/utility on December 4, 1989. While on the SEA–LAND COMMITMENT, Waiters' job was to change and launder linens. On December 28, 1989, the SEA–LAND COMMITMENT encountered rough seas in the North Atlantic. That day Waiters was on linen duty and was trying to carry a sack of dirty linen out of an elevator.

Waiters propped open the elevator door with his feet so he could drag the sack out. The ship rolled and the elevator door struck Waiters in the same location on his lower back where he had been injured while aboard the OVERSEAS MARILYN. Waiters told the captain he had a previous injury there and his pain had flared up. Waiters testified the captain told him he could do nothing until they got to port. On January 4, 1990, doctors at a South Carolina medical center examined Waiters and found him unfit for duty. On January 17, 1990, Waiters saw Dr. Cupic, who stated he was unfit for duty. Dr. Cupic continued to find Waiters unfit for duty through April 8, 1990. On January 31, 1990, Dr. Mazow examined Waiters and found him unfit for duty through February 17, 1990. On February 20, 1990, Waiters demanded Maritime pay him maintenance for January 4, 1990, through February 17, 1990, because his injuries were a recurrence of pain from previous back injuries. Maritime paid maintenance for that period. On March 21, 1990, Dr. Andrew examined Waiters and found there was no objective evidence of injury. On April 8, 1990, Waiters went to work on another ship. On another ship on May 14, 1990, Waiters injured his back while lifting 25 pounds of meat. Dr. Cupic found Waiters unfit for duty and continued to see no change in Waiters' condition during repeated visits. Waiters requested that the Sea–Land Corporation, owner of the SEA–LAND COMMITMENT, pay maintenance and cure from February 18, 1990, through April 30, 1990. A February 20, 1990, letter to Maritime stated that Waiters requested Sea–Land to pay maintenance as it was the last vessel he was on. The letter adds that "in order to avoid a possible indemnity claim, if you [Maritime] wish to assume further responsibility for the maintenance payments at this time, we would have no objection." Maritime did not pay maintenance and cure from February 18, 1990, through April 30, 1990.

Waiters sued Maritime under the Jones Act for negligence, and under general maritime law for unseaworthiness,[3] past due

3. An action for unseaworthiness is a claim that the owner of the vessel has not provided a vessel

maintenance and cure,[4] attorney fees, and compensatory and punitive damages. The jury found for Maritime on the issues of seaworthiness and negligence. The jury also found Maritime was arbitrary and capricious in not paying Waiters' maintenance and cure, and awarded punitive damages. The jury also awarded compensatory damages and prejudgment interest to Waiters. On appeal, Maritime challenges the award of compensatory and punitive damages and prejudgment interest.

In our analysis of Maritime's points of error we look to cases from the federal circuit courts of appeal after finding that neither the United States Supreme Court nor the Texas Supreme Court has considered these issues.

## A.

### Compensatory Damages

In points of error one and two, Maritime contends the trial court erred in overruling its motion for judgment notwithstanding the verdict, motion to disregard the jury findings, motion for directed verdict, and objections to the jury charge because Waiters was not entitled to compensatory damages of $1,000.

Maritime argues Waiters presented no evidence that he suffered an aggravation of his injury because he did not receive maintenance and cure. Waiters contends the evidence showed he would have been hospitalized had his benefits not been cut off, and that he suffered financial and psychological harm.

In question number nine, the jury was asked,

What sum of money, if any, do you find would fairly and reasonably compensate plaintiff for his damages, if any, that you find resulted from such unreasonable conduct? Consider only such losses suffered or incurred by plaintiff as a direct result of such conduct. Do not include any amounts awarded in other questions in this charge.

Answer: 1,000.

■■■ Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service. *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88 (1962). A seaman is entitled to maintenance and cure until the date of maximum possible cure, when no further treatment will improve the condition. *Johnson v. Marlin Drilling Co.*, 893 F.2d 77, 79 (5th Cir.1990). The obligation to pay maintenance arises out of the contractual relationship between the seaman and his employer, and is designed to ensure his recovery if he is injured or becomes ill while in the service of the ship. *Vaughan*, 369 U.S. at 532, 82 S.Ct. at 1000–01.

■■■ When a seaman becomes ill or is injured while in the service of his ship, the shipowner must pay him maintenance and cure whether or not the shipowner was at fault or the ship unseaworthy. *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987). Upon receiving a claim for maintenance and cure, the shipowner need not immediately begin payments; the shipowner is entitled to investigate and corroborate the claim. *Id.* If, after investigation, the shipowner unreasonably rejects the claim, when in fact the seaman is due maintenance and cure, the owner becomes liable not only for the maintenance and cure payments, but also for compensatory damages. *Id.* These are the damages that are caused by the denial of payment, such as the aggravation of the seaman's condition, determined by the usual principles applied in tort cases to measure compensatory damages. *Id.* A shipowner who is liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. *Id.* It is reasonable to deny payment of maintenance and cure to an injured seaman when a diligent investigation indicates that the seaman's claim is not legitimate or if the seaman does not submit medical reports to document his claim. *Id.* at 1360. All ambiguities and doubts regarding liability must be resolved in favor of the

reasonably fit for its intended purpose.

---

4. An action for maintenance and cure is separate from a claim of negligence under the Jones Act or a claim of unseaworthiness.

seaman. *Vaughan,* 369 U.S. at 532, 82 S.Ct. at 1000; *Johnson,* 893 F.2d at 79. Because of this rule, when the opinions of doctors are in conflict regarding the seaman's condition, the court must resolve the conflict in favor of the seaman's right to maintenance and cure.

The seaman bears the burden of proof that he suffered an injury in addition to the one caused in the boating mishap. *Smith v. Delaware Bay Launch Serv., Inc.,* 842 F.Supp. 770, 775 (D.Del.1994). The seaman must prove that the failure to pay maintenance and cure was a cause of his additional injury or that the failure to pay maintenance and cure prolonged or aggravated the injury. *Id.* In these circumstances, the question of causation is whether the failure to receive maintenance and cure payments was a cause of plaintiff's failure to obtain some type of medical treatment. *Id.* at 775–76. There can be no injury or aggravation from failure to pay maintenance and cure if the plaintiff was able to receive adequate food, lodging, and medical treatment. *Id.* at 776. If, however, the seaman is forced to work to support himself to survive, it is some evidence of injury. *Vaughan,* 369 U.S. at 533, 82 S.Ct. at 1001.

In *Smith,* the court held that a seaman's claim for compensatory damages stemming from the shipowner's denial of maintenance and cure benefits was not warranted because the evidence in the record did not show any aggravation of his injury. 842 F.Supp. at 776. The court held that even though a doctor testified that the seaman could not pay for the medicine there was no evidence that the seaman's condition worsened because he did not get the medicine. *Id.* The court reasoned that in order to receive compensatory damages there has to be a causal relationship between the employer's failure to pay and an injury that occurred. *Id.* In contrast with *Smith,* the plaintiff in this case was not able to secure adequate medical treatment. Dr. Cupic's notes state:

> The patient is short of funds, however. And apparently no one is willing to pay for his hospitalization. He would like to go back to work on a trial basis.

After returning to work, the plaintiff injured himself a second time.

In *Hodges v. Keystone Shipping Co.,* 578 F.Supp. 620, 623 (S.D.Tex.1983), the United States District Court in Galveston considered a case involving compensatory damages in a case where the shipowner did not pay an injured seaman timely maintenance and cure. *Id.* The seaman testified that he was unable to work and provide for himself, and could not afford to pay for pain medication. *Id.* The seaman testified that he suffered from emotional stress, anxiety and depression as a result. *Id.* A doctor testified that the lack of medication would likely cause headaches, emotional stress, and muscular spasms. *Id.* The seaman also testified that he was forced to move because he could not pay his rent and did not have money to pay for transportation to and from the doctor. *Id.* The jury awarded $75,000 in compensatory damages for the denial of maintenance and cure payments, but the court held the evidence only supported an award of $12,500 in compensatory damages. *Id.* at 623–24.

When an appellant challenges the legal sufficiency of the evidence to support an adverse finding, we must consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988).

We look at the record to determine whether there is any evidence to support the jury's award of $1,000 in compensatory damages. The evidence in the record that supports a claim of aggravation is that in an August 9, 1989, report Dr. Cupic said Waiters was short of funds and nobody would pay for hospitalization. Because he was short of funds, the plaintiff was forced to take employment and he then re-injured himself.

Waiters testified that when he was cut off from maintenance and cure benefits, it frightened him. Because he could not pay

his bills, he worried about being put out of doors and worried about his family. "So it just hurt." He also contends that his family was under tremendous psychological pressure due to the uncertainties of how he would put food on the table or obtain medical treatment.

We find there is some evidence that Waiters' suffered other tort damages as a result of Maritime's termination of his maintenance and cure. Because the plaintiff was not able to secure adequate medical treatment on his own, Maritime's failure to pay maintenance and cure aggravated or prolonged the plaintiff's condition. *Smith*, 842 F.Supp. at 776.

We overrule point of error one and affirm the jury's finding of compensatory damages of $1,000.

### B.

### Punitive damages

■■ In points of error three and four, Maritime contends the trial court erred in overruling its objection to the jury charge, its motion for judgment notwithstanding the verdict, and its motion to disregard the jury findings because Waiters was not entitled to punitive damages. Maritime argues there is no evidence to support the jury's findings that its failure to promptly and timely pay maintenance and cure was willful, arbitrary, and capricious and therefore supported an award of $10,000 in punitive damages.

Waiters argues the evidence shows:

1. He was declared unfit for duty from April 4, 1989, through August 9, 1989, and made a written demand for benefits.

2. Maritime stopped Waiters' maintenance benefits as of June 28, 1989, and did not pay any other benefits.

3. The jury found Maritime's doctor to be so lacking in credibility as to find it arbitrary and unreasonable for Maritime to have relied on the doctor's opinion in terminating Waiters' benefits.

4. Waiters was declared unfit for duty from January 4, 1990, through April 8,

1990. He made a written demand for maintenance payments. Maritime paid through February 17, 1990, but then stopped without explanation.

5. Maritime did not pay $1,555 in medical bills to Dr. Cupic, even after Waiters requested payment and forwarded additional medical records to support the claims.

Maritime argues it stopped payments on June 28, 1989, after Dr. Andrew found Waiters had reached maximum cure. It contends the bill for Dr. Cupic's services included medical bills from 1990 through 1993 that were never forwarded to it for payment. It also contends Waiters never demanded Maritime pay maintenance after February 17, 1990. Maritime contends Waiters only demanded Sea–Land Corporation pay because Waiters was injured while serving on Sea–Land's ship.

We first consider whether punitive damages are available in a general maritime action for maintenance and cure.

### 1. Punitive damages and maintenance and cure

The Fifth Circuit has repeatedly held that punitive damages are available in an action for maintenance and cure when there is evidence that the shipowner acted arbitrarily and capriciously. *Guevara v. Maritime Overseas Corp.*, 34 F.3d 1279, 1282 (5th Cir. 1994)[5]; *Breese v. AWI, Inc.*, 823 F.2d 100, 103 (5th Cir.1987); *Yelverton v. Mobile Labs., Inc.*, 782 F.2d 555, 558 (5th Cir.1986); *Tullos v. Resource Drilling, Inc.*, 750 F.2d 380, 388 (5th Cir.1985); *Harper v. Zapata Off–Shore Co.*, 741 F.2d 87, 88 (5th Cir.1984).

Maritime relies on a Texas Supreme Court case that dealt with the issue of whether punitive damages were recoverable under general maritime law in an unseaworthiness action involving nonfatal injuries in *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296–97 (Tex.1993). In *Penrod*, the seaman sought punitive damages for gross negligence and wanton or willful breach of warranty of seaworthiness. *Id.* at 295. The *Penrod*

**5.** In a concurring opinion, Justice Garwood argued that the Fifth Circuit should reconsider its holdings that punitive damages are available for failure to pay maintenance and cure. The Fifth Circuit voted en banc to rehear *Guevara*, which was argued on January 17, 1995.

court held punitive damages were not available and looked to the U.S. Supreme Court's analysis in *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). In *Miles*, the U.S. Supreme Court held that nonpecuniary damages, such as loss of society, are not recoverable by Jones Act [6] seamen.[7] 498 U.S. at 27, 111 S.Ct. at 325–26. In *Penrod*, the Supreme Court extended the rationale of *Miles* to deny punitive damages in an action under general maritime law. The court reasoned that the U.S. Supreme Court's concern with uniformity and consistency between general maritime law and the Jones Act made it necessary to hold that nonpecuniary damages in a general maritime law action were not recoverable. *Id.* at 297. We note that in *Penrod*, the court stated in a footnote that the issue decided in the case did not resolve the issue of whether *Miles* extends to general maritime law causes of action other than unseaworthiness. *Id.* at 297 n. 4.

Maritime relies also on a Corpus Christi case that disallowed punitive damages in a wrongful death action against the owner of a shrimping vessel. *Ricardo N., Inc. v. Turcios de Argueta*, 870 S.W.2d 95, 122 (Tex. App.—Corpus Christi 1993, writ granted). The Corpus Christi court relied on *Penrod* and reversed the award of $200,000 in punitive damages, finding that the damages were nonpecuniary. We do not find *Penrod* to be authority here or that the Corpus Christi court's analysis applies to an action for maintenance and cure. We therefore look to cases from the Fifth Circuit in our analysis.

Maritime did not cite a recent case in which it appealed the same issue, decided by the Fourteenth Court of Appeals. *See Maritime Overseas Corp. v. Ellis*, 886 S.W.2d 780, 795 (Tex.App.—Houston [14th Dist.] 1994, no writ). In *Ellis*, the Fourteenth Court held that punitive damages are available if there is proof the shipowner's failure to pay maintenance and cure is willfull, arbitrary, and capricious. *Id.* The court, however, reversed the award of $1 million in punitive damages, holding there was no evidence to support the jury's finding because the seaman had not notified Maritime of claims for payment after he left the ship. *Id.* at 796.

The only case Maritime cites that supports its position that punitive damages are not available for failure to pay maintenance and cure is *La Voie v. Kualoa Ranch & Activity Club, Inc.*, 797 F.Supp. 827, 831 (D. Hawai'i 1992).

Based on the Fifth Circuit cases and the *Ellis* opinion from the Fourteenth Court of Appeals, we hold that punitive damages are available in an action for maintenance and cure when the shipowner acted in an arbitrary and capricious manner. We next consider whether the evidence supports the jury's decision that Maritime's actions were arbitrary and capricious.

## 2. Arbitrary and capricious

 The Fifth Circuit has held that the willful, wanton and callous conduct required to support an award of punitive damages requires an element of bad faith. *Harper*, 741 F.2d at 90. The following are examples

6. The Jones Act is a federal statute that provides a remedy to any seaman who suffers personal injuries in the course of his employment due to the negligence of his employer or the employer's officers, agents, or other employees. Waiters is a Jones Act seaman because he was a member of a crew of a vessel in navigation. The Act provides:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for dam-

ages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

46 App.U.S.C.A. § 688(a) (West Supp.1994)

7. In *Miles*, the parent of a Jones Act seaman who died while at sea sued the employer for negligence under the Jones Act and unseaworthiness under general maritime law. The parent sought loss of society damages under the unseaworthiness claim. Both *Miles* and *Penrod* involved claims of negligence.

of an employer's behavior that can merit punitive damages in a maintenance and cure case: (1) if employer is lax in investigating a claim; (2) if the employer terminates benefits in response to the seaman's retention of counsel or refusal of a settlement offer; (3) if the employer does not reinstate benefits after diagnosis of an ailment previously not determined medically. *Tullos,* 750 F.2d at 388. In *Tullos,* the court held the issue of whether the seaman had reached maximum care and the shipowner acted in bad faith in denying him maintenance and cure is one for the jury. *Id.* at 388–89. The *Tullos* shipowner terminated maintenance payments, relying on the opinion of its own doctor, which was in conflict with the medical opinion of the seaman's doctor, that the seaman had reached the maximum possible cure. *Id.* The Fifth Circuit reversed, holding the trial court should have submitted the issue of punitive damages to the jury. *Id.* at 389.

■■■ The evidence in this case that supports the jury's finding that Maritime acted arbitrarily and capriciously is:

1. Maritime stopped making maintenance and cure payments on June 28, 1989, six days after Dr. Andrew determined Waiters had reached maximum medical improvement.[8] Dr. Cupic found that Waiters was not fit for duty.

2. Dr. Mazow found Waiters was not fit for duty through February 17, 1990, and Maritime terminated payment at that time. Dr. Cupic still found Waiters was not fit for duty.

3. On February 20, 1990, Waiters demanded that Maritime pay $1,555 in unpaid medical bills from Dr. Cupic for medical bills from April 19, 1989 through September 20, 1989. Maritime never paid Dr. Cupic's bills.

In question number 10, the jury was asked whether the defendant acted willfully, arbitrarily and/or capriciously in failing to timely and properly pay required maintenance and/or cure to or in behalf of the plaintiff. The jury answered "yes." In question number 11, the jury was asked what sum of money should be assessed against the defendants and awarded to the plaintiff as exemplary damages for its behavior in failing to timely and properly pay required maintenance and/or cure to or in behalf of the plaintiff. The question instructed the jury that in determining the amount of exemplary damages, it could consider: (1) the nature of the wrong, (2) the frequency of the wrongs committed, (3) the character of the conduct involved, (4) the degree of culpability of the wrongdoer, (5) the situation and sensibilities of the parties concerned, (6) the extent to which such conduct offends the public sense of justice and propriety, and (7) the size of the award needed to deter similar wrongs in the future. The jury awarded $10,000.

We find there is some evidence in the record to support the jury's findings that Maritime acted arbitrarily and capriciously.

We overrule points of error three and four.

## C.

### Prejudgment interest

In point of error five, Maritime argues the trial court erred as a matter of law in awarding prejudgment interest on the award of actual and compensatory damages because the claim was tried to a jury without an issue being submitted regarding Waiters' right to prejudgment interest. In point of error six, Maritime argues the trial court erred as a matter of law in awarding prejudgment interest on the award of actual and compensatory damages because it was inequitable to apply the usual rule granting prejudgment interest. To these points, Waiters respond there is a strong presumption in admiralty cases in favor of awarding prejudgment interest, and Maritime did not meet its burden of showing that the trial court abused its discretion in awarding him prejudgment interest.

■■■ The first issue is whether prejudgment interest is available in this type of case. A seaman's right to prejudgment interest is governed by federal, not state law. *Wyatt v. Penrod Drilling Co.,* 735 F.2d 951, 955 (5th Cir.1984). The award of prejudgment interest is the rule rather than the

---

**8.** Dr. Andrew testified that he did not feel Waiters' neck problems were related to the March 29, 1989, injury.

exception. *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir.1986). Prejudgment interest should be awarded in admiralty cases not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. *Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191, 1196 (5th Cir.1982). We hold that prejudgment interest usually is available in this type of case.

 The second issue is whether Waiters waived the right to prejudgment interest by not presenting the issue of prejudgment interest to the jury. Under maritime law, the decision to award prejudgment interest is solely within the province of the jury. *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 208 n. 6 (1st Cir.1988). When the issue of prejudgment interest is not submitted to the jury, the district court has no authority to award such interest. *Morales*, 829 F.2d at 1361. In *Carey*, because the appellant did not request a jury instruction regarding prejudgment interest, the court found she was precluded from receiving it. 864 F.2d at 208 n. 6. In *Morales*, the court vacated the award of prejudgment interest to a seaman who was awarded maintenance and cure benefits because no issue was submitted to the jury. 829 F.2d at 1361.

We sustain points of error five and six and reform the judgment to eliminate prejudgment interest, and as reformed, affirm.