William O. HUDSPETH, Plaintiff,

v.

ATLANTIC & GULF STEVEDORES, INC., Defendant.

Civ. A. No. 66–819.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 17, 1967.

Wilson M. Montero, Jr., New Orleans, La., for plaintiff.

Cornelius G. Van Dalen, New Orleans, La., for defendant.

RUBIN, District Judge:

This motion for summary judgment puts the question: Is a seaman who usually provides his own meals even while working aboard his ship and who usually returns to his home ashore at night entitled to be paid maintenance during a period of disability resulting from an injury received in the service of his vessel? The answer is neither self-evident nor is it provided clearly by the school of decisions concerning seamen's rights. Yet on principle it appears to this court that the seaman in such a case is worthy of his maintenance.

William O. Hudspeth was employed by Atlantic & Gulf as a deckhand aboard a tug, The M/V McGRATH No. 2. The McGRATH is a push boat, and most of the time it works in the New Orleans Harbor. The regular crew consisted only of the Captain and Hudspeth. Hudspeth did not have seaman's papers. He was paid $2.27 per hour, with time and one-half for hours in excess of forty in one week. His duties were varied. He was both engineer and deckhand. Occasionally, he relieved the Captain at the wheel. He usually received no meals aboard ship. When possible, he ate his lunch ashore. If his work duties did not permit him to go ashore at meal time, he heated coffee, or made a sandwich, or warmed a can of food aboard ship. He lived in Metairie with his wife and six children, and usually spent each night at home. However, whenever required to do so by irregular work calls, he remained aboard the tug at night. On these occasions, he provided his own sheets and pillows.

The tug had a galley of sorts, with a butane stove, but meals were not usually prepared aboard. Occasionally, the tug pushed barges or derricks a relatively short distance up the Mississippi River, to Taft. In the seven months before the accident, Hudspeth took three such voyages, one for three days in January, 1966; one for a single day in August, 1966; and the last one for two days on August 7 and 8, 1966. When such trips were made, Hudspeth's employer gave the master of the tug $10 to buy food for himself and Hudspeth. At such times, Hudspeth prepared the food aboard ship.

On August 31, 1966, at about 5:30 P.M., Hudspeth left the tug and went ashore at the Alcoa Wharf in New Orleans to get a meal for himself and the master. He went to a hamburger shop where he ate his own meal while waiting for the master's order to be fixed. He then returned to the wharf and gave the master his lunch, his change, and his drink. He started to go back to the tug, but the master suggested that Hudspeth telephone the superintendent for orders concerning the night's work. Hudspeth went into a shed on the wharf to make the call, but was unable to reach the superintendent. When

he returned, the captain invited him to sit down. • He sat down on or rested against a pallet board which was leaning against a wall. The pallet board slipped and struck Hudspeth, injuring his back.

Although it denied liability to Hudspeth, Atlantic & Gulf paid him maintenance in the total sum of $504, at the rate of $6.00 per day, and he received free medical care at the United States Public Health Hospital as well as from defendant's own physician. When Hudspeth's lawyer sought an increase to $8.00 per day, Atlantic & Gulf's lawyer decided that Hudspeth was entitled to nothing for maintenance because he did not receive lodging or meals aboard the vessel, and the payment of maintenance was discontinued.

Hudspeth then sued seeking the payment of maintenance at the rate of $6.00 a day and damages and attorney's fees for the refusal to pay maintenance alleging this to be arbitrary, unreasonable, and without justification or cause.

The defendant contends that this matter is not ripe for summary judgment. Apparently it believes that shoals of factual disputes lie hidden in this suit and that, despite the affidavits and depositions that have been filed in support of the motion, the channel is not yet well marked enough for decision of this case. But there does not appear to be any genuine dispute about any question of fact that is material to the issues now posed. While the waters are somewhat murky, the difficulty of seeing is caused by uncertainty of legal principles, not by factual differences.

█ The ancient sea codes recognized the right of seamen to maintenance and cure when they became ill or were injured in the service of their ships. The

obligation of the shipowner to pay maintenance and cure to ill or injured seamen was first recognized in this country in the case of Harden v. Gordon, Fed. Cas. 6047 (CC Me.1823). There Judge Story, in a passage that has become a navigation chart for admiralty lawyers, based the allowance on reasons that were profoundly humanitarian, buttressed by an argument of dubious economic and psychological logic,[1] and a generalization about seamen's character that would be at least questionable today.[2] Today the right is recognized in general maritime law as a part of the seaman's contract of employment,[3] incident to his status in the employment of his ship.

At first, the seaman's right to maintenance and cure lasted only for the remainder of the voyage for which he had signed, and consisted of payment by the shipowner of his wages, cure (in the sense of medical and nursing care), and subsistence.[4] The exact amount to which a seaman is entitled, however, is not clearly set forth in the American cases.

The sea codes of the Middle Ages attempted to define with precision the extent of the seaman's right to maintenance. Excerpts from some of these are set forth in Norris, The Law of Seamen, § 538. Thus, The Laws of Oleron (dating from the 12th Century) provided:

"Art. VII. If it happens that sickness seizes on any one of the mariners, while in the service of the ship, the master ought * * * likewise to afford him such diet as is usual in the ship; that is to say, so much as he had on shipboard in his health, and nothing more, unless it please the master to allow it him; and if he will have better diet, the master shall not be found to provide it for him, unless

---

1. "It [the right of a sick or injured seaman to receive maintenance and cure] encourages seamen to engage in perilous voyages with more promptitude, and at lower wages."

2. "They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence."

3. Norris, The Law of Seamen, § 545; O'Donnell v. Great Lakes Dredge and Dock Company, 1943, 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596; Aguilar v. Standard Oil Company, 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107.

4. The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.

it be at the mariner's own cost and charges * * *."

Similarly, The Laws of Wisbury (13th Century) stated:

"Art. XIX. If a seaman falls ill of any disease, and it is convenient to put him ashore, he shall be fed as he was aboard. * * *"

And The Laws of the Hanse Towns, which were used in the 17th Century, contained similar language:

"Art. XLV. If any mariner falls sick of any disease, he shall be put ashore and maintained in like manner as if he was on shipboard * * *."

The American maritime cases contain generalizations similar to, but less explicit, than the rules of the sea codes. In The Bouker No. 2, 241 F. 831 (2d Cir. 1917), cert. den. 245 U.S. 647, 38 S.Ct. 9, 62 L.Ed. 529, when the principle was established that the right to maintenance and cure extends a reasonable time beyond the duration of the voyage, the right was defined as follows:

"By the custom of the sea the hiring of sailors has for centuries included food and lodging at the expense of the ship. This is their maintenance, and the origin of the word indicates the kind and to a certain extent the quantum of assistance due the sailor from his ship."

In Calmar S. S. Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993, the Supreme Court decided that the duty of a shipowner to provide mainte-nance and cure to a seaman who became ill of an incurable disease while in its employ did not extend to the payment of a lump sum sufficient to defray the cost of maintenance and cure for the remainder of his life. Discussing the basic nature of the right, the Court said:

"The maintenance exacted is comparable to that to which the seaman is entitled while at sea, The Henry B. Fiske, 141 F. 188, 192 (D.C.); The Mars, 145 F. 446, 447 (D.C.), affirmed 149 F. 729 (C.C.A.); The Bouker No. 2, supra, 836, and 'cure' is care, including nursing and medical atten-tion during such period as the duty continues. Whitney v. Olsen, 108 F. 292, 297 (C.C.A.) and cases cited; Dougherty v. Thompson-Lockhart Co., 211 F. 224, 227 (D.C.)."

Similar generalizations can be found in other American cases.[5] In none of these cases, however, does it appear that the court was confronted with the necessity of tacking its sails to the wind that blows here, for the courts apparently proceeded on the hypothesis that the disabled seaman was a typical blue water tar.

But it is now certain that the seaman's right to maintenance and cure is a basic term of his employment contract, and it should not be treated like the "landman's remedy so often a promise to the ear to be broken to the hope."[6]

"It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple,

---

5. Thus, in Muise v. Abbott, 1st Cir. 1947, 160 F.2d 590, the Court said that " * * * the right, at least as to maintenance and care, i. e., maintenance ashore of a quality comparable to that to which the seaman is entitled while at sea, and the fair value of the nursing and medical care required, * * * arises even though the seaman's injury was not received on shipboard * * *" and in McCarthy v. American Eastern Corp., 3rd Cir. 1949, 175 F.2d 727, the Court observed that " * * * the maintenance to which [an injured seaman] is entitled after leaving the ship during the time needed for treat-ment and cure is under the maritime law the equivalent of that ordinarily furnished a seaman at sea." Many like observations are found in Norris, The Law of Seamen. Thus in § 540, at page 586, this author states that, "While being cured his maintenance takes the place of the seaman's sustenance, of the standard and quality to which he is entitled while aboard ship." See also Ibid., at § 543, page 593; § 546, page 598; § 570, page 646; and § 605, page 696.

6. Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850.

and can be understood and administered without technical considerations." [7]

Admiralty courts have been liberal in interpreting the duty to pay maintenance "for the benefit and protection of the seamen who are its wards." [8] "Certainly the nature and foundations of the liability require that it be not narrowly confined or whittled down by restrictive and artificial distinctions defeating its broad and beneficial purposes." [9] For the shipowner's liability for maintenance and cure is among "the most pervasive" of all. When there are ambiguities or doubts, they are resolved in favor of the seaman.[10]

The "ancient solicitude of courts of admiralty for those who labor at sea" [11] continues unchanged despite the progress from canvas sails to diesel engines. For the injured seaman is entitled to be certain of "receiving compensation intended to be sufficient to pay for his care." [12]

When faced head-on with a situation in which a seaman provided his own meals and did not live aboard his ship but went home after each day's work, most courts have allowed an injured seaman maintenance sufficient to cover the cost of meals and lodging (albeit sometimes without discussion of the fact that this might exceed what he received aboard ship). This was done in Weiss v. Central Railroad Co. of New Jersey, 2d Cir. 1956, 235 F.2d 309, in which the plaintiff was employed both to do duties ashore and as a deckhand on a ferry. He worked as an extra, that is, he was called in to replace other employees temporarily absent from their regular duties. During his employment, which lasted only thirteen days, the plaintiff was employed ashore six days, and he worked on the ferry boat a total of seven days. He slept at home and ate his meals there, except for lunch. He became sick as a result of reactivation of a latent condition of pulmonary tuberculosis.

It was urged that the plaintiff was not entitled to an allowance for maintenance. Chief Judge Clark's opinion dealt at length with the question whether the plaintiff was a seaman within the meaning of the Jones Act, 46 U.S.C. § 688. He concluded that "If an employee is a a 'seaman' for those purposes [that is for purposes of the Jones Act], he is by the same token a 'master or member of a crew of any vessel' within the meaning of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, 903(a) (1), and is excluded from the coverage of that Act." Once it was established that the plaintiff was a seaman, he was entitled to the same rights as every other seaman, regardless of the fact that his working conditions were different from those of the typical seafarer. In this connection the court observed:

"We know of no authority, however, for holding that a seaman is not entitled to the traditional privileges of his status merely because his voyages are short, because he sleeps ashore, or for other reasons his lot is more pleasant than that of most of his brethren. Further, so to hold would be to create a genre of 'seamen' ineligible for the benefits of maintenance and cure, yet equally barred from recovery under the Longshoremen's Act, 33

---

7. Farrell v. United States, 1949, 336 U.S. 511, 516. 69 S.Ct. 707. 709, 93 L.Ed. 850, 854; Couts v. Erickson, 5th Cir. 1957, 241 F.2d 499.

8. Calmar Steamship Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. See also Vaughn v. Atkinson, 1962, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88, and cases cited therein.

9. Aguilar v. Standard Oil Company, 1943, 318 U.S. 724, 735, 63 S.Ct. 930, 936, 87 L.Ed. 1107, 1116. See also Warren v. United States, 1951, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503.

10. Aguilar v. Standard Oil Company, 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107. See also Warren v. United States, 1951, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503.

11. Weiss v. Central Railroad Co. of New Jersey, 2d Cir. 1956, 235 F.2d 309, 311.

12. Norris, The Law of Seamen, 1962, § 536, page 577.

U.S.C. § 903(a) (1). This surely was not the intention of Congress."

In his dissent, Judge Lumbard agreed with the other members of the court that every person who is a "master or member of a crew" within the meaning of the Longshoremen's Act and who is therefore excluded from its remedies is also a "seaman" entitled to maintenance and cure. But he differed with the conclusion that Weiss was a seaman entitled to maintenance and cure. He urged that the term has a different meaning in determining who may sue for unseaworthiness and who is entitled to maintenance and cure. The considerations leading to recognition of the right were not applicable, he felt, to cases like the one before the court. The plaintiff should not have been awarded maintenance because he was not the kind of seaman entitled to that remedy. He worked ashore a good part of the time; he had no permanent connection with a ship; and he worked aboard various ferries irregularly. But it is implicit in the rationale of the dissent that, if Judge Lumbard had been convinced that the plaintiff was a seaman, he would have joined the majority in allowing maintenance.

The present case is therefore stronger than the *Weiss* case. For the defendant admits, as indeed it must under the facts, that it "employed plaintiff * * * as a seaman and member of the crew of said vessel in the capacity of deckhand." It is true that Hudspeth's working conditions were more like those of a landlubber than those of the blue water sailor with respect to his hours of work, manner of lodging and method of compensation. In these regards, Hudspeth was not, like Jack in the folk song, every inch a sailor. But he was undoubtedly a member of the crew of his vessel, and he was subject to many of the hazards of the sea. By the rationale of the *Weiss* case, he is entitled to all of the rights of a seaman.

Similar results have been reached in other cases. In The City of Avalon, 9th Cir. 1946, 156 F.2d 500, a fisherman was to be paid a share of the catch. While on the vessel, he paid for his own food. He was disabled on a voyage and sought maintenance. The district court denied him recovery for food and allowed only the seaman's cost of lodging. The Court of Appeals increased the maintenance allowance to cover the cost of food notwithstanding the fact that the vessel upon which libelant was injured did not provide him with meals. The appellee attempted to justify the lower court's decision by the statement in Calmar Steamship Co. v. Taylor, 1938, 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993, 997, quoted above, that "[t]he maintenance exacted is comparable to that to which the seaman is entitled while at sea." The appellate court said: "We do not agree. This statement means no more than that an injured man during his disability is to be maintained in no better or worse condition than at sea. The purpose of the historic implied contract to maintain an injured seaman arises from his helplessness during his injury, a right 'every court should watch with jealousy' to maintain."

A similar issue was silently dealt with in Creppel v. J. W. Banta Towing Inc., E.D.La.1962, 202 F.Supp. 508. That case involved the master of a tug which worked around docks in the Mississippi River at Baton Rouge, Louisiana. He lived ashore and came aboard to work his watch. He was paid $20 a day for days actually worked. The court awarded him maintenance, fixing it at $8.00 which the parties had stipulated was the proper rate "during the period of disability for which maintenance may be recoverable."

In Ledet v. U. S. Oil of Louisiana, Inc., E.D.La.1964, 237 F.Supp. 183, a roughneck was injured while working offshore. He was held entitled to receive maintenance and cure for the entire period of time from the date of his injury until the day of trial, except for the time when he was in a hospital and was being furnished with meals and lodging, even though this obviously included periods in which the seaman would have been

ashore providing his own meals and lodging had he not been injured.

The libelant in Rowald v. Cargo Carriers, Inc., E.D.Mo.1965, 243 F.Supp. 629, worked aboard a motor vessel thirty days and was ashore thirty days. He was paid at all times, whether aboard ship or on shore. He became ill during a period of shore duty. The court awarded him maintenance and cure at the rate of $6.00 per day during the period of his illness even though he apparently would have furnished his own meals and lodging during his usual periods ashore.

The only case that is in any part contrary appears to be Alexandervich v. Gallagher Bros., 2d Cir. 1961, 298 F.2d 918. There libelant was a cook aboard a tug, and worked two out of every three weeks. During each two week tour, he lived aboard the tug and his meals and lodging were provided. He was injured while working aboard the tug. He sued for damages for his injury, loss of earnings (including his "found," or meals and lodging, as part of his earnings), and maintenance and cure up until the time he reached maximum cure. The lower court awarded "found" at the rate of $8.00 per day for the period following his discharge from the Public Health Hospital until the date of his trial. This figure was reduced by one-third to reflect the fact that his meals and lodging were furnished only two-thirds of the time. On appeal, the court held that plaintiff was not entitled to "found" as part of his damages in tort because he maintained a home for his family and was therefore not out of pocket with respect to the lodging element of "found." His award for "found" was therefore reduced to the extent that it included an allowance for lodging, but the court held that, for the period between his discharge from the hospital and the time he reached the point of maximum cure, he was entitled to maintenance. The fact that the injured seaman maintained a home for his family where he lived

during his recuperation did not reduce the daily rate to be paid him for maintenance. The Court of Appeals therefore approved the payment of maintenance at the rate of $8.00 per day, but allowed this amount of maintenance only for those days during the period that plaintiff would have worked aboard the boat and received lodging and subsistence. There was no discussion of the reason for the reduction during the usual shore period.

■ To deny one who is clearly a seaman the right to maintenance merely because he does not receive lodging and meals aboard ship raises problems that would distort the simple lines of the maintenance remedy. The logical extension of such a rule would be to hold that, if such a seaman is hospitalized, he must provide his own meals; his employer need provide only the cure. If a seaman were at sea five days a week, but was normally ashore and provided his own lodging and food two days a week, the same reasoning would indicate that he should be paid maintenance only for $5/7$ of the period during which he is disabled. In the present case the plaintiff received an allowance for meals for six days in the seven months preceding the injury; is he to be given a maintenance allowance of $6/7$ of a day per month? Indeed, the rationale that maintenance is allowable only when meals would have been served aboard challenges the now well settled doctrine that the disabled seaman is entitled to be paid maintenance beyond the end of his voyage,[13] for were maintenance to be allowed only for those days during which the ship would have served him meals, it would end when the voyage was over.

■ Having come this far, we find the remaining issues to be considered before determining the right to summary judgment relatively easy. While such matters as status of a seaman and the proper amount for maintenance and cure are usually factual issues, they may be

---

13. The Bouker No. 2, 2d Cir. 1917, 241 F. 831; Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850.

determined on motion for summary judgment where the "extraneous materials" in support of the motion "establish with certainty that there is no triable issue of fact, and in that event summary judgment should be rendered for the party entitled thereto as a matter of law." [14]

The defendant contends that the plaintiff's injury was not caused by or contributed to by any fault, neglect, or want of care on the defendant's part or by the unseaworthiness of the defendant's tug, but was caused solely by the plaintiff's own negligence. This, however, is no defense to the present claim because neither the negligence of the owner or of the crew of the vessel, nor the unseaworthiness of the vessel enter into consideration with respect to recovery for maintenance. There is no set-off or defense for contributory negligence nor any fellow servant rule or doctrine of assumption of risk. Aguilar v. Standard Oil Company, 1943, 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107. Only some willful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection, Ibid., 318 U.S. at 731, 63 S.Ct. 930.

Hudspeth was a seaman. He was injured in the service of his vessel. During the period for which he seeks maintenance, he has been disabled on account of his injury, he has been under medical treatment as an outpatient, and he has not yet been found fit for duty. He has reasonable prospect for improvement or eventual recovery. He has supported himself. There remains only the question of the proper amount due him.

The amount of maintenance to which an injured seaman is entitled is a factual question. [15] Some courts have measured it by the amount necessary to provide meals and lodging ashore of the same character that were furnished aboard ship; [16] but other authorities say the amount is to be based on proof of the seaman's out-of-pocket expenses. [17] Maritime union contracts frequently fix the daily maintenance rate and this rate is usually applied to seamen covered by the contract. [18] At last one text writer says that "even if there is no union rate applicable to a particular case, a court may take judicial notice of the amount fixed by union agreements in the area." [19] Courts have sometimes considered the union contract rate as persuasive of the reasonableness of the sum fixed even when it is not directly applicable, [20] or as admissible evidence in the absence of other proof, [21] or as at least one factor tending to show the reasonable value of maintenance. [22]

The Court of Appeals for the Fifth Circuit has said that "the seaman's recovery must be measured by the reasonable cost of that maintenance and cure to which [the plaintiff] is entitled at the time of the trial." United States v. Robinson, 5th Cir. 1948, 170 F.2d 578. This means the reasonable cost of meals and lodging ashore of a type that the injured seaman would normally require. The union contracts introduced by affidavit in this case provide some evidence of the proper rate. The fact that the defendant paid Hudspeth maintenance at the rate of $6.00 per day

14. Moore, Federal Practice, ¶56.17(35).

15. Norris, The Law of Seamen, § 605, page 696.

16. Calmar Steamship Corp. v. Taylor, 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993.

17. Stankiewicz v. United Fruit Steamship Corp., 2d Cir. 1956, 229 F.2d 580; Field v. Waterman Steamship Corp., 5th Cir. 1939, 104 F.2d 849.

18. Reardon v. California Tanker Co., 2d Cir. 1958, 260 F.2d 369, cert. den. 1959,

359 U.S. 926, 79 S.Ct. 609, 3 L.Ed.2d 628; Bartholomew v. Universe Tankships Inc., 2d Cir. 1960, 279 F.2d 911.

19. Edelman, Maritime Injury and Death, p. 13.

20. Keefe v. America Pacific S/S Co., S.D. Cal.1953, 110 F.Supp. 853.

21. Curd v. United States, E.D.La.1954, 118 F.Supp. 921.

22. Yates v. Dann, Del.1954, 124 F.Supp. 125.

until payments were discontinued tends to show what rate the defendant itself considered reasonable. The cash allowance given the members of the crew of the McGRATH for meals when they were sent out of the New Orleans Harbor area was approximately $2.50 per day. Taking all of these factors into account, I conclude that all of the material facts necessary to determine the proper amount of maintenance are in evidence and that a daily rate of $6.00 is reasonable.[23]

But this does not mean that the plaintiff is also entitled to attorney's fees or to separate and additional damages. In Vaughn v. Atkinson, 1962, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88, attorney's fees incurred by the plaintiff were allowed as damages because the shipowner was callous in its attitude, made no investigation of the seaman's claim, and its default was found to be "willful and persistent." The Second Circuit Court of Appeals reads this opinion "to allow recovery of counsel fees only where the employer is shown to have been 'callous' or 'recalcitrant' in" his refusal. Roberts v. SS Argentina, 2d Cir. 1966, 359 F.2d 430; see in accord Diaz v. Gulf Oil Corp., S.D.N.Y.1965, 237 F.Supp. 261; Pyles v. American Trading and Production Corp., S.D.Tex.1965, 244 F.Supp. 685. In the cases in this district in which attorney's fees or other damages have been allowed, the court found that the shipowner was "lax in investigating a claim which they would have found to have merit" and "was arbitrary and un-reasonable" in its refusal to pay, Stewart v. S. S. Richmond, E.D.La.1963, 214 F.Supp. 135, or that the owner had "no reasonable excuse" for its refusal, Sims v. Marine Catering Service, E.D.La.1963, 217 F.Supp. 511. It is true that one court has observed that the award of attorney's fees "is discretionary with the court," but it cited as its sole authority the Supreme Court's decision in the *Vaughn* case, which clearly does not support such a conclusion. Rowald v. Cargo Carriers, Inc., E.D.Mo.1965, 243 F.Supp. 629.

 Here the question of Hudspeth's right to maintenance was seriously mooted, and the defendant contested its liability in good faith. Notwithstanding the hardship which the plaintiff has suffered as a result of the failure to pay him maintenance, there is no sound authority upon which this court can base an award to him for either damages or attorney's fees.

The Clerk is therefore directed to enter judgment for maintenance at the rate of $6.00 per day, from December 9, 1966, to date, exclusive of any period of hospitalization during that period, without prejudice to plaintiff's right to such future maintenance as he may be entitled to recover, with interest at the rate of 5% per annum on each week's maintenance included in that period from its due date until paid, but denying the plaintiff's other demands. This opinion will serve instead of findings of fact and conclusions of law.

---

23. See, for example, the following cases in which the rate was fixed by agreement of the parties: Creppel v. J. W. Banta Towing, Inc., D.C.La.1962, 202 F.Supp. 508, $8.00; Theriot v. Aetna Casualty & Surety Co., D.C.La.1963, 215 F.Supp. 36, $8.00; and the following cases in which the rate was fixed by the court: Gros v. Galloway, D.C.La.1965, 1065 AMC 1876, $8.00; Richards v. Crescent Towing and Salvage Co., Inc., D.C.La. 1958, 161 F.Supp. 820, $6.00; and Rose v. Bloomfield Steamship Co., D.C.La. 1958, 162 F.Supp. 576, $8.00.