Revised February 22, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 00-60063

---

JAMES HALL,

Plaintiff-Appellee,

versus

NOBLE DRILLING (U.S.) INC.;
NOBLE DRILLING SERVICES, INC.,

Defendants-Appellants.

*******************************************************************

00-60065

CHARLES BYRON STUART,

Plaintiff-Appellee,

versus

NOBLE DRILLING (U.S.) INC.;
NOBLE DRILLING SERVICES, INC.,

Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Mississippi

---

February 14, 2001

Before GARWOOD, HIGGINBOTHAM, and STEWART, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This admiralty case involves the calculation of maintenance.

Plaintiffs James Hall and Charles Byron Stuart are seamen employed

by defendant Noble Drilling (U.S.) Inc. ("Noble") who were injured

during their employment on offshore rigs.  The district court awarded maintenance of $30.50 to Stuart and $31.50 to Hall, based in part on the costs of their shelter, homes that they share with their families.

Noble argues that maintenance is provided solely for the benefit of the seaman, and thus the maintenance rate should have been reduced to reflect only the seaman's pro rata portion of the mortgage on the family home.  We agree with Noble's premise that maintenance is provided solely for the benefit of the seaman, but we reject Noble's conclusion.  In this case, the plaintiffs actually paid their entire mortgages; they were obligated to pay their entire mortgages; and their food and lodging expenses were reasonable.  We affirm the ruling of the district court.

I

Plaintiffs Charles Byron Stuart and James Hall are both seamen employed by Noble Drilling (U.S.) Inc.  Stuart lives in Petal, Mississippi, with his wife and two young children.  Hall lives in Columbia, Mississippi, with his wife and adult son.  Both live in houses for which they pay mortgages.

Stuart was injured on October 3 or 4, 1998, while aboard the Noble jack-up rig EDDIE PAUL.  Hall was injured on February 7, 1999, while aboard the Noble jack-up rig M/V BILL JENNINGS.  Noble has paid them each $21 a day in maintenance.

Stuart and Hall brought suit in admiralty against Noble in May and June, 1999, respectively.  They made claims under the Jones Act

and the doctrines of unseaworthiness and maintenance and cure. Hall and Stuart each sought an increase in their rate of maintenance. The cases were consolidated, and trial on the issue of the proper maintenance rates was held.

At trial, Stuart and Hall presented itemized lists of their expenses, which included housing and food, telephone, satellite TV, automobile, and other expenses. They also presented an expert witness who described their expenses and provided national and regional estimates of the cost of food and lodging. The food and lodging estimates based on national statistics varied from $27.85 to $49.23 for a single person.[1] Noble presented evidence of the costs of various forms of lodging in the area and its own expert witness, who concluded that $13.17 to $18.52 per day would provide adequate maintenance.

Stuart claimed entitlement to $45.93 per day based on an itemized list of his expenses. Of this figure, he claimed $14.24 for mortgage, escrow, and real estate insurance; $5.43 for utilities; $9.47 for food;[2] and $16.78 in telephone, cable TV, house maintenance, and automobile expenses.[3]

---

[1] Their estimates for local costs were based on unscientific surveys that found average room and board costs of $28.72 to $56.62 in the Petal area and $56.33 in the Columbia area.

[2] This reflected only food purchased for his own consumption.

[3] These numbers total to $45.92; the $45.93 figure may be due to mathematical error.

Hall claimed entitlement to $51.45 per day based on a similar list of expenses. He claimed $20.27 for mortgage, escrow, and real estate insurance; $6.41 for utilities; $10.39 for food;[4] $11.09 in telephone, satellite TV, house maintenance, and automobile expenses; and $3.29 for the prorated cost of some dental work.

The trial judge noted that maintenance does not provide for expenses such as telephone or automobile bills or the costs of supporting children. The judge then awarded Stuart a maintenance rate of $30.50 per day and awarded Hall a maintenance rate of $31.50 per day. Noble appealed.[5] On appeal, Noble challenges the amount of the maintenance awards.[6] Noble's primary argument is that since Hall and Stuart live with their families, their lodging expenses should be divided among the members of the household; the maintenance awards, then, should only reflect Stuart's and Hall's pro rata share of food and lodging expenses.

II

---

[4] Like Stuart, Hall did not include food consumed by his family.

[5] This is an interlocutory appeal brought under 28 U.S.C. § 1292(a)(3).

[6] Noble does not argue that Stuart and Hall are not entitled to maintenance. The parties agree that Stuart and Hall are seamen injured in the service of vessels. *See Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1131 (5th Cir. Unit A 1981) ("A seaman who is injured or falls ill while he is in the service of the ship is entitled to recover 'maintenance' from his employer or the shipowner."). No union contract specifying maintenance is at issue in this case. Nor is cure an issue.

4

Maintenance and its counterpart, cure, have a venerable history in the jurisprudence of admiralty,[7] with origins at the beginning of the last millennium.[8] In the last century, American courts have developed and expanded the right to maintenance and cure, adapting it to the changing duties of seamen in modern commerce. While centuries ago the typical seaman was a single man—perhaps without a home—who spent most of his life at sea, today the typical seaman may be someone very much like the plaintiffs in this case: a worker on a floating rig who has a home and family and spends significant stretches of time onshore.

This juxtaposition of the ancient right of maintenance, protecting the "poor and friendless" seaman,[9] with the cases of modern seamen with families and mortgages is at the heart of this case. Courts have long held that in providing maintenance the ship owner must "furnish the seaman with food and lodging of the kind

---

[7] This history is only briefly discussed here; other cases have studiously expounded it. The seminal discussions in American law appear in *Harden v. Gordon*, 11 F. Cas. 480 (C.C. Me. 1823) (No. 6,047), and *The Osceola*, 189 U.S. 158 (1903). An exceptional account of the history and law of maintenance and cure appears in *Hudspeth v. Atlantic & Gulf Stevedores, Inc.*, 266 F. Supp. 937 (E.D. La. 1967). The ancient sea codes forming the historical foundation of maintenance and cure are described in Martin J. Norris, 2 *The Law of Seamen* § 26:3-4 (4th Ed. 1985).

[8] The antecedents to the medieval codes cited in *The Osceola*, 189 U.S. at 169, date back to at least the year 1010. *See* Martin J. Norris, 2 *The Law of Seamen* § 26:3 at 5 n.4 (4th Ed. 1985).

[9] *Harden v. Gordon*, 11 F. Cas. at 483.

5

and quality he would have received . . . aboard [the] ship."[10]  Yet in this appeal the parties focus their attention on Stuart's and Hall's housing costs and the number of people in their families. We examine the historical source of this incongruity and then turn to the facts of this case.

A

1

The maritime doctrine of maintenance entitles a seaman injured in the service of his ship to "food and lodging of the kind and quality he would have received . . . aboard [the] ship."[11]  This articulation of the standard for the amount of maintenance originated from the obligation of the shipowner to provide room and board to seamen during the voyage.[12]  This equivalence between food and lodging onshore and room and board during the voyage was natural, given that American courts originally held that the shipowner's obligation to provide maintenance extended only to the end of the voyage.[13]

---

[10] *Tate v. American Tugs, Inc.*, 634 F.2d 869, 871 (5th Cir. Unit A 1981); *see also Springborn v. American Commercial Barge Lines, Inc.*, 767 F.2d 89, 94 (5th Cir. 1985); *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938).

[11] *Tate*, 634 F.2d at 871.

[12] *The Bouker No. 2*, 241 F. 831, 835 (2d Cir. 1917) ("By the custom of the sea the hiring of sailors has for centuries included food and lodging at the expense of the ship.  This is their maintenance, and the origin of the word indicates the kind and to a certain extent the quantum of assistance due the sailor from his ship.").

[13] *See* Norris, 2 *The Law of Seamen* § 26:25 at 72 (collecting cases).

The logical foundation for this formulation has eroded, however. By the turn of the last century, American courts had embraced the rule that maintenance extends beyond the end of the seaman's voyage to the time of maximum cure.[14] And in more recent years courts have awarded maintenance and cure to seamen who have no room or board on their vessels.[15] Nonetheless, the notion that the shipowner must provide the seaman with the equivalent of his food and lodging on the ship remains the touchstone for calculating maintenance.

The expansion in the last century of the scope of maintenance has complicated the calculation of the appropriate rate of maintenance. Most obviously, seamen with no food or lodging on board their vessels cannot compare their shoreside accommodations to quarters that don't exist. But the determination of maintenance is also complicated by the fact that little, if any, lodging on land is truly equivalent to quarters on a vessel; that, as in this case, some seamen have existing accommodations on land; and that, as a practical matter, seamen have historically lacked the

---

[14] Courts in this circuit recognized this rule as early as 1887. *See The Lizzie Frank*, 31 F. 477, 481 (S.D. Ala. 1887). The seminal case is *The Bouker No. 2*, 241 F. 831 (2d Cir. 1917), which thoroughly reviews prior authority. The Supreme Court endorsed the modern rule in *Calmar S.S. Corp.*, 303 U.S. at 529.

[15] *See Barnes v. Andover Co.*, 900 F.2d 630, 640-44 (3d Cir. 1990); *Hudspeth v. Atlantic & Gulf Stevedores, Inc.*, 266 F. Supp. 937, 943 (E.D. La. 1967).

resources to present detailed proof in suits for maintenance and cure.[16]

Understanding these practical and conceptual difficulties, courts have not required literal equivalence of facilities onshore and in the vessel. Instead, the reference to a seaman's shipboard food and lodging serves to define the amount of maintenance as no more and no less than the reasonable costs of subsistence the seaman has incurred while recuperating on land.[17] This breaks down into two components: the reasonable cost of food and lodging for a seaman living alone, and the actual expenses for food and lodging that the seaman has incurred. We address courts' treatment of these components of the maintenance calculation in turn.

2

A seaman is entitled to the reasonable cost of food and lodging, provided he has incurred the expense. Proving reasonable costs admits of many forms of proof. Courts allow proof of the seaman's actual expenditures and expert testimony about the cost of

---

[16] The expense of litigation to recover what may be mere dollars a day may limit the ability of seamen to offer elaborate proof. *See Yelverton v. Mobile Laboratories, Inc.*, 782 F.2d 555, 558 (5th Cir. 1986) (noting that "the evidence before the court often consists solely of the seaman's testimony"); *see also Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528-29 (1938) (describing seamen as "poor, friendless and improvident . . . [and who may] be left helpless and uncared for in a foreign port" and stating that seamen are the wards of admiralty).

[17] While "food" is self-explanatory, lodging requires definition. "Lodging" includes expenses "necessary to the provision of habitable housing," such as heat, electricity, home insurance, and real estate taxes. *See Gillikin v. United States*, 764 F. Supp. 270, 273 (E.D. N.Y. 1991). Other expenses, such as telephone service, clothing, toiletries, and travel, are not part of maintenance. *See id.; Smith v. Delaware Bay Launch Serv., Inc.*, 972 F. Supp. 836, 849 (D. Del. 1997).

living in the area of the seaman's residence.[18] Courts also allow evidence of maintenance rates negotiated by unions,[19] per diem allowances for seamen in port when the vessel's facilities are unavailable,[20] and, of course, the cost of food and lodging equivalent to food and lodging on the vessel, if such exist on land. The use of evidence of actual expenses should not obscure the fact that this evidence is offered to prove not only actual, but also reasonable expenses. Thus, maintenance awards should depend on the reasonable cost of food and lodging for a seaman living alone in the seaman's locality.[21]

Since the reasonable cost of food and lodging for a single seaman in an area is an objective standard, "the rate at which maintenance is paid tends to become standardized to reflect the costs of food and lodging in a particular area."[22] The historical tendency towards uniform rates of maintenance has simplified

---

[18] In fact, exclusion of such evidence is reversible error. *See McWilliams v. Texaco, Inc.*, 781 F.2d 514, 517 (5th Cir. 1986) (holding that it is error to exclude evidence of plaintiff's expenses or of the costs of living in the locality); *Curry v. Fluor Drilling Serv., Inc.*, 715 F.2d 893, 896 (5th Cir. 1983) (stating that the seaman's prima facie case is proving "the actual living expenditures which he found necessary to incur during his convalescence").

[19] *See Hudspeth v. Atlantic & Gulf Stevedores, Inc.*, 266 F. Supp. 937, 944 (E.D. La. 1967).

[20] *See Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 91 (5th Cir. 1984).

[21] Thus, the expenses of seaman not living alone usually are of little relevance to determining the reasonable amount of maintenance.

[22] *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1132 (5th Cir. Unit A 1981); *see also Yelverton*, 782 F.2d at 558; *Harper*, 741 F.2d at 91 (describing the $8 rate as "entrenched" in past years "as the standard figure" but "unquestionably low").

litigation over the reasonable amount of maintenance to the benefit of both shipowner and seaman. Standard rates of maintenance protect the seaman's interest in recovering maintenance without great delay or expense and without disparities between seamen; and it protects the shipowner's interest in predictable obligations and reduced litigation. Uniform rates also reduce the decision costs of courts and the impact of maintenance litigation on the docket.

3

We have consistently held that "one who has not paid his own expenses . . . cannot recover maintenance and cure from the ship owner."[23] Courts have treated maintenance not as a payment owed from shipowner to seaman, but as an obligation of the shipowner to ensure that the seaman can afford food and lodging. Thus, the shipowner is obligated to pay the seaman no more than the seaman actually spends to obtain reasonable food and lodging.[24] If the seaman's food and lodging are both reasonable in quality and free, he is entitled to no maintenance from the shipowner.

However, if the seaman's actual expenses are not sufficient to afford him food and lodging that are reasonably adequate, the court

---

[23] *Marine Drilling, Inc. v. Landry*, 302 F.2d 127, 128 (5th Cir. 1962) (per curiam). The seminal case is *Field v. Waterman S.S. Corp.*, 104 F.2d 849, 851 (5th Cir. 1939). The Supreme Court has followed *Field*. *See Johnson v. United States*, 333 U.S. 46, 50 (1948).

[24] If the seaman presents evidence that he paid for food, but no evidence that he paid for lodging, a maintenance award may cover food expenses but not lodging. *Harper v. Zapata Off-Shore Co.*, 741 F.2d 87, 91 (5th Cir. 1984) (reversing award of maintenance because plaintiff presented no evidence of housing expenses).

should award maintenance sufficient to provide reasonable food and lodging, even if the award exceeds the seaman's actual costs.[25] Also, when the seaman has made "an expressed intention" to pay for lodging and food, even if the obligation is not legally enforceable, the seaman may recover maintenance.[26]  The burden of producing evidence of expenses is "feather light," and a court may award reasonable expenses, even if the precise amount of actual expenses is not conclusively proved.[27]

More recently, shipowners have argued that a seaman's food and lodging expenses should be prorated when a seaman lives with his family.  Since maintenance provides only for the expenses of the seaman, the expenses of the seaman's spouse or children are not properly included in maintenance.  Thus, a seaman may only present evidence of expenditures on food eaten by himself.  If division of family food expenses is difficult, prorating the costs is an appropriate method of estimation.[28]

---

[25] *See McWilliams v. Texaco, Inc.*, 781 F.2d 514, 517-18 (5th Cir. 1986) ("Actual expenses do not always provide a satisfactory benchmark, because in many cases a seaman may not have sufficient funds to obtain the kind of maintenance which the law provides him.").

[26] *McCormick Shipping Corp. v. Duvalier*, 311 F.2d 933, 933 (5th Cir. 1963) (per curiam).

[27] *See Yelverton*, 782 F.2d at 558 ("A seaman's burden of production in establishing the value of maintenance is feather light: his own testimony as to reasonable cost of room and board in the community where he is living is sufficient to support an award.  Because the evidence before the court often consists solely of the seaman's testimony, it is common for courts to award a standard per diem.") (citation omitted).

[28] *See Gillikin*, 764 F. Supp. at 272; *see also Barnes v. Andover Co.*, 900 F.2d 630, 644 (3d Cir. 1990); *Ritchie v. Grimm*, 724 F. Supp. 59, 61 (E.D. N.Y. 1989).  While *Gillikin* also concludes that fixed lodging expenses should be

11

Lodging costs present a more difficult question that has not been addressed by this circuit. In this appeal, Noble argues that since three or four people living together can live more cheaply than three or four people each living alone, maintenance should cover only a seaman's pro rata share of his lodging expenses when he lives with his family. This argument misunderstands maintenance.

A seaman is entitled to the reasonable cost of food and lodging in his locality, provided that he actually spends that amount on his upkeep. If the seaman spends less than that amount, the seaman may recover his actual expenses. A seaman who pays for the rent or mortgage of a home he shares with his family actually spends out-of-pocket the entire amount.[29] He cannot pay any less without losing his home.[30] If a seaman would incur the lodging expenses of the home even if living alone, then the entire lodging expense represents the seaman's actual expenses.[31]

prorated, 764 F. Supp. at 275, *Ritchie* does not. 724 F. Supp. at 61 ("[T]he Court holds that the proper amount of maintenance should include the total cost of rent for [the seaman's] apartment as well as his share of food and other costs.").

[29] As we have noted above, a seaman may recover for expenses he is obligated to pay or has promised to pay. *See McCormick Shipping Corp. v. Duvalier*, 311 F.2d 933, 933 (5th Cir. 1963) (per curiam). A seaman who pays for his rent or mortgage is obligated to pay the rent or mortgage regardless of the number of people living with him.

[30] Of course, if the seaman does not pay for the entire amount of the lodging costs, the seaman cannot recover for the entire amount, regardless of whether he lives alone.

[31] Costs of heat, electricity, and water, to the extent such expenses vary with the number of people in the household, can be prorated. But to the extent that additional family members do not increase a seaman's expenses, proration

12

Thus, the non-prorated amount a seaman spends on his home is his actual cost of lodging. Noble is obviously correct that a house for two or four or ten may be much more than the seaman needs for himself alone, and the mortgage for such a house will surely cost more than he needs to spend. But this argument concerns whether the seaman's expenses are reasonable, not whether the seaman actually spends that money on his home. If the seaman's expenditures exceed the reasonable amount, the seaman is entitled only to the reasonable amount that a single seaman must spend.

Reasonableness, not proration, is the proper limit on maintenance awards for seamen living with their families. The concern motivating proration is that a seaman with a large house for his family should not be reimbursed for the cost of a home so far in excess of his individual needs. But the requirement that maintenance be limited to the reasonable expenses of a single seaman dispenses with this concern.

Proration punishes a seaman for his thrift. If a seaman rents a one-bedroom apartment for a reasonable amount, he is certainly entitled to reimbursement for all of his actual lodging expenses, since this is modest for even a single person. But under Noble's logic, if this seaman had a spouse, or a spouse and child, he would receive only half or a third of what a reasonable person living alone is entitled to. But a seaman who buys a very large house

_____

would not be appropriate. For example, the costs of heating a home may be lower when more people occupy the same space.

will receive all of what a reasonable person living alone is entitled to, since his costs, even after proration, will exceed the reasonable amount.

Proration also introduces excessive conceptual complexity into a remedy that courts have striven to keep simple.[32] And requiring proration would spawn curious results. If seaman has a child during the course of his recovery, would his maintenance decrease? In what sense would his own costs of food and lodging have decreased? If a seaman's family leaves during his convalescence, should his maintenance rise? Have his lodging expenses changed? Should two seaman, both injured in the service of the same vessel, living in identical houses and eating the same food, receive different maintenance because one has more children?

4

Thus: A plaintiff who is a seaman injured while in the service of a vessel is entitled to maintenance if he incurred the costs of food and lodging during that period. The plaintiff must present evidence to the court that is sufficient to provide an evidentiary basis for the court to estimate his actual costs. If the plaintiff presents no evidence of actual expenses, the plaintiff may not

---

[32] As the Supreme Court has noted, the treatment of maintenance by the courts has historically served these interests: "It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigations." *Farrell v. United States*, 336 U.S. 511, 516 (1949).

14

recover maintenance. Otherwise, the court must determine the maintenance award. This involves three steps.

First, the court must estimate two amounts: the plaintiff seaman's actual costs of food and lodging; and the reasonable cost of food and lodging for a single seaman in the locality of the plaintiff. In determining the reasonable costs of food and lodging, the court may consider evidence in the form of the seaman's actual costs, evidence of reasonable costs in the locality or region, union contracts stipulating a rate of maintenance or per diem payments for shoreside food or lodging while in the service of a vessel, and maintenance rates awarded in other cases for seamen in the same region. A seaman need not present evidence of the reasonable rate; a court may take judicial notice of the prevailing rate in the district.[33]

Second, the court must compare the seaman's actual expenses to reasonable expenses. If actual expenses exceed reasonable expenses, the court should award reasonable expenses. Otherwise, the court should award actual expenses. Thus, the general rule is that seamen are entitled to maintenance in the amount of their actual expenses on food and lodging up to the reasonable amount for their locality.

---

[33] *See, e.g., Duplantis v. Williams-McWilliams Industries, Inc.*, 298 F. Supp. 13 (E.D. La. 1969), where the court relied on judicial notice of union contracts and other cases to find that $8 per day was a reasonable rate of maintenance. *See id.* at 16.

15

Third, there is one exception to this rule that the court must consider.  If the court concludes that the plaintiff's actual expenses were inadequate to provide him with reasonable food and lodging, the plaintiff is entitled to the amount that the court has determined is the reasonable cost of food and lodging.[34]  This insures that the plaintiff's inability to pay for food and lodging in the absence of maintenance payments does not prevent him from recovering enough to afford himself reasonable sustenance and shelter.

B

We now turn to the maintenance awards that are the subject of this appeal.  Determination of the amount of maintenance is a factual question reviewed under the "clearly erroneous" standard. "A maintenance award will be upheld as long as there is an evidentiary basis for the district court's finding."[35]  Stuart and Hall had to provide evidence of their actual expenses on food and lodging sufficient to constitute an evidentiary basis for the court's awards of maintenance.  They did so.

First, there is an evidentiary basis for the district court to have concluded that Stuart's actual maintenance expenses were approximately $30.50 per day, and that Hall's actual maintenance expenses were at least $31.50 per day.  The total of Stuart's

---

[34] *See McWilliams v. Texaco, Inc.*, 781 F.2d 514, 517-18 (5th Cir. 1986).

[35] *Curry v. Fluor Drilling Serv., Inc.*, 715 F.2d 893, 896 (5th Cir. 1983); *see also Wood v. Diamond M Drilling Co.*, 691 F.2d 1165, 1171 (5th Cir. 1982).

maintenance expenses—mortgage, escrow, real estate insurance, utilities, and food—that Stuart claimed and supported by evidence is $29.14 per day. The total maintenance expenses claimed and supported by Hall is $37.07 per day.

Noble challenges these figures because they are based on their total mortgage payments and argues that the lodging costs should be prorated. Proration is not appropriate in this case. Stuart and Hall have each individually promised (both to their banks and to their families) to pay their entire mortgages. They offered evidence to show that they paid their entire mortgages themselves. If they had paid any less, they would have had to have found new places to live. Thus, their entire mortgage payments are necessary for their continued shelter in their homes.

Second, there is an evidentiary basis for the district court's conclusion that awards of $30.50 and $31.50 per day do not exceed the reasonable amount a single seaman would spend on food and lodging. The local and national figures for the cost of food and lodging offered by Stuart and Hall ranged from $27.85 to $49.23 per day for a person living alone.

Third, this is not the exceptional case where a seaman's expenditures were inadequate to provide him reasonable food and lodging.

Thus, the evidence supports the awards of maintenance. We find no error in the maintenance awards.

C

17

At oral argument, counsel for Noble invited this court to announce a standardized rate of maintenance.  As noted above, maintenance awards were quite uniform in the past.  From the late 1940s until the 1970s, that rate was usually $8.[36]  Courts and commentators began to recognize that as prices rose, the value of this standard rate eroded.[37]  In the late 1970s and 1980s, courts observing this phenomenon began to adjust the standard rate upward to reflect inflation.[38]  In the late 1970s and early 1980s, this circuit affirmed awards of $15,[39] $20,[40] and $30.[41]  Since that time,

---

[36] *See  Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1132 (5th Cir. Unit A 1981).  For an exhaustive list of maintenance awards from the 1920s through the 1990s, see Martin J. Norris, 2 *The Law of Seamen* § 26:70 (4th Ed. 1985 & Supp 2000).

[37] *See Morel v. Sabine Towing & Transp. Co.*, 669 F.2d 345, 347 (5th Cir. 1982); *Caulfield*, 633 F.2d at 1132; G. Gilmore & C. Black, *The Law of Admiralty* § 6-12 (2d ed. 1975); Norris, 2 *The Law of Seamen* § 26:70 at 174; Eugene A. Brodsky & Karen M. Houston, *From Subsistence to Starvation: A Call for Judicial Reexamination of* Gardiner v. Sea Land Service, Inc., 9 U.S.F. Mar. L.J. 71, 81 (Fall 1996).

[38] The development of this trend is described in Comment, *Around the World on Eight Dollars a Day: The Binding Effect of Maintenance Rate Provisions in Collective Bargaining Agreements*, 18 Tul. Mar. L.J. 317, 330-32 (Summer 1994).

[39] *See Caulfield*, 633 F.2d at 1132; *see also Robinson v. Plimsoll Marine, Inc.*, 460 F. Supp. 949, 950 (E.D. La. 1978).

[40] *Morel*, 669 F.2d at 347.

[41] *See Wood v. Diamond M Drilling Co.*, 691 F.2d 1165, 1171 (5th Cir. 1982).

18

similar awards have been typical in this circuit.[42] Several cases have identified the trend.[43]

This trend has approximately compensated for the impact of inflation on the seaman's buying power. Once inflation is taken into account, the awards to Hall and Stuart are equivalent to the awards of $6 or $8 a day in the 1960s[44] and to the awards of $15 or $20 a day in the late 1970s and early 1980s.[45]

---

[42] *See* Norris, 2 *The Law of Seamen* § 26:70 at Supp 61 and cases cited therein. In 1981, the Second Circuit ordered an award of $26.80 per day to a seaman living in New York, where the cost of living is higher. *See Incandela v. American Dredging Co.*, 659 F.2d 11, 14 (2d Cir. 1981) (reversing $13.50 per day award and awarding $26.80 per day). In 1990, the Second Circuit affirmed an award of $45 per day for a seaman in New York City. *See Rodriguez Alvarez v. Bahama Cruise Line, Inc.*, 898 F.2d 312, 314-15 (2d Cir. 1990).

[43] *See Barnes v. Andover Co.*, 900 F.2d 630, 635-37 (3d Cir. 1990) (identifying trend and noting that $8 a day in 1952 was worth $32.24 in 1985); *Morel*, 669 F.2d at 347; *Incandela*, 659 F.2d at 14; *Caulfield*, 633 F.2d at 1132; *Robinson*, 460 F. Supp. at 950; *see also Harper v. Zapata Off-Shore Co.*, 563 F. Supp. 576, 584 & n.4 (E.D. La. 1983) (holding that jury award of $40 per day in maintenance is not excessive and noting that $40 per day is the "rough equivalent" of the $8 per day rate prevailing in 1945), *rev'd on other grounds*, 741 F.2d 47 (5th Cir. 1984). In the early 1980s, the Western District of Louisiana would award $15 per day in maintenance, absent contrary proof. *See Curry v. Fluor Drilling Serv., Inc.*, 715 F.2d 893, 896 (5th Cir. 1983) (Tate, J., specially concurring).

[44] In 1999 dollars (the district court in this case rendered its judgment in 1999), the $6 per day award in *Hudspeth v. Atlantic & Gulf Stevedores, Inc.*, 266 F. Supp. at 945 (awarded in 1967), is approximately $29.95 per day; the $8 per day award in *Duplantis v. Williams-McWilliams Industries, Inc.*, 298 F. Supp. at 16 (awarded in 1969), is about $36.34 per day. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *Consumer Price Index for All Urban Consumers: All Items*. This comparison is not perfect, however, because the consumer price index reflects changes in the cost of living nationally rather than locally; also, *Hudspeth* and *Duplantis* arose out of Louisiana, not Mississippi.

[45] In 1999 dollars, the $15 per day award in *Robinson*, 460 F. Supp. at 950 (awarded in 1978), is about $38.35 per day; the $20 per day award affirmed in *Morel*, 669 F.2d at 347-48 (awarded in 1981), is approximately $36.68 per day. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *Consumer Price Index for All Urban Consumers: All Items*. Like *Hudspeth* and *Duplantis*, *Morel* and *Robinson* arose out of Louisiana.

Awarding a standardized rate of maintenance is appropriate as long as the seaman provides evidence that his actual expenses meet or exceed the standard, reasonable amount. And while we note that the maintenance awards in this case are consistent with the historical trend in standard maintenance rates, we cannot prescribe one of those awards (or any other amount) as a proper standard for the reasonable amount of maintenance. Sitting as a court of review, we do not have the competence to determine the factual question of what the standard amount should be for any part of this circuit. Determining what amount of maintenance is reasonable is a duty invested in the district courts of this circuit, sitting as finders of fact. We today affirm the propriety of developing standard rates of maintenance, but leave that task to the district courts of this circuit.[46]

### III

We find no error in the district court's awards of maintenance. The district court's judgments are AFFIRMED.

---

[46] We offer only the admonishment that uniform maintenance awards require that courts take account of changes in the cost of living over time and between localities.